# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-800


**STATE OF LOUISIANA**

**VERSUS**

**NATHAN STRINGER**

**********

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 72104
HONORABLE J. P. MAUFFRAY, JR., DISTRICT JUDGE

**********

## ELIZABETH A. PICKETT
## JUDGE

**********

Court composed of Glenn B. Gremillion, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED.**


**Sherry Watters**
**Louisiana Appellate Project**
**P. O. Box 58769**
**New Orleans, LA 70158-8769**
**Counsel for Defendant/Appellant:**
    **Nathan Stringer**

**Hon. J. Reed Walters**
**District Attorney - 28th JDC**
**P. O. Box 1940**
**Jena, LA 71342-1940**
**Counsel for Appellee:**
    **State of Louisiana**

**Pickett, Judge.**

The victim, Nick Brandenburg, was reported missing in April, 2003. His body was found floating in Little River in Grant Parish on April 27, 2003. An autopsy revealed that the victim had sixteen gunshot wounds, as well as a wire and rope tied around his wrist, legs and right ankle. The exact date and time of the victim's death was not determinable due to advanced decomposition.

Following an investigation, the defendant, Nathan Stringer, was charged by bill of indictment on June 12, 2003 with second degree murder in violation of La.R.S. 14:30.1. At his arraignment on June 30, 2003, the defendant pled not guilty.

The district court convened for a jury trial on the matter on April 18 and 19, 2005. Following two days of jury venire, a joint motion for mistrial was granted due to potential problems with the prospective jury panel.

The defendant subsequently moved to change venue based on a strong likelihood for mistrial because a sufficient number of community members had knowledge of "the facts, alleged facts or simple rumor" involving the case. Following a hearing on the matter, the district court denied the defendant's request.

The matter proceeded to a jury trial lasting from January 30, 2006 until February 2, 2006. The jury found the defendant guilty of second degree murder. He was subsequently sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. Following a separate hearing, the court also ordered that the defendant pay restitution for the funeral costs to the victim's family.

Defense counsel objected to the sentence, although we could not locate a formal Motion for Reconsideration in the record. The defendant appears now before this court to appeal his conviction.

1

## ASSIGNMENTS OF ERROR

Specifically, the defendant asserts the following three assignments of error:

1. The State failed to negate the possibility of misidentification and prove the identity of Nathan Stringer as the perpetrator beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence.

2. The court erred in preventing Nathan Stringer from presenting any impeachment witnesses and from making effective cross examination, thereby denying him the Sixth Amendment right to confrontation and to present a defense.

3. Nathan Stringer did not receive effective assistance of counsel as guaranteed by the Sixth Amendment, which prevented him from getting a fair trial and [sic] probably would have resulted in a different outcome with competent trial counsel.

The victim, Nick Brandenburg, was reported missing in April, 2003. His body was found floating in Little River in Grant Parish on April 27, 2003. An autopsy revealed that the victim had sixteen gunshot wounds, as well as a wire and rope tied around his wrist, legs and right ankle. The exact date and time of the victim's death was not determinable due to advanced decomposition.

## ASSIGNMENT OF ERROR NUMBER ONE:

In his first assignment of error, the defendant contends there was insufficient evidence presented to support his conviction for second degree murder.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d

2

559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The defendant was convicted of second degree murder, defined in pertinent part, by La.R.S. 14:30.1, which states that "[s]econd degree murder is the killing of a human being: (1) [w]hen the offender has a specific intent to kill or to inflict great bodily harm."

In regard to the element of intent required for a conviction of second degree murder, this court has explained:

> Thus, the State must prove beyond a reasonable doubt that the Defendant specifically intended to kill . . . and that he "committed an 'act for the purpose of and tending directly toward the accomplishing of' that intent." *State v. Williams*, 95-879, p. 3 (La.App. 3 Cir. 1/31/96), 670 So.2d 414, 416 (citation omitted). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "[S]pecific criminal intent need not be proven as fact but may be inferred from the circumstances of the case and actions of the defendant." *State v. Robertson*, 98-883, p. 6 (La.App. 3 Cir. 12/9/98), 723 So.2d 500, 504 (citations omitted), *writ denied*, 99-0658 (La.6/25/99), 745 So.2d 1187.

*State v. Jones*, 03-180, pp. 4-5 (La.App. 3 Cir. 9/10/03), 855 So.2d 408, 411-12, *writ denied*, 04-409 (La. 1/14/05), 889 So.2d 262.

In his appellate brief, the defendant raises numerous claims within his sufficiency argument. Generally, the defendant alleges that the evidence presented by the state was insufficient because it did not negate every reasonable hypothesis of innocence. He also alleges that the trial court failed to properly instruct the jury regarding the weight to be given to the testimony of certain witnesses.

The defendant testified at his trial that he and the victim were friends. Mr. Brandenburg, the victim, was the boyfriend of Trinda Poole, who was a cousin to Tiffany Otwell Thompson, the defendant's girlfriend. The defendant stated that he had heard rumors that the victim had been labeled a "narc" because he had provided incriminating evidence to police officers regarding alleged criminal activities by the defendant, Donald Lee Chevallier, Bo Franklin and Terry Stringer. The defendant suggests on appeal that he knew that Mr. Chevallier and Mr. Franklin had made threats and put out an offer of reward for Mr. Brandenburg's death because of his alleged talks with police.

The defendant stated that early in the evening on Friday, April 18, 2003, Mr. Brandenburg and he were at the home he shared with his girlfriend, Ms. Otwell Thompson. The defendant testified that he wanted to talk to the victim about the rumors that he had heard, so he invited Mr. Brandenburg to go with him as he went to visit friends Clay and Francis Breland. In support, he called Francis Breland, who testified that the defendant and Mr. Brandenburg visited her house on Good Friday between 3:30 and 4:30 in the afternoon. She stated that the men helped her fix a water leak while they were there and that Mr. Brandenburg did not appear to be ill at ease or frightened.

After they left the Breland home, the defendant said that the men rode around talking until he received a call from his father, Terry. The defendant testified that he subsequently dropped Mr. Brandenburg off with his father. He alleges in his brief to this court that he did not see the victim alive again after leaving him with his father.

However, Tiffany Otwell Thompson offered a different account of the day's events. Ms. Otwell Thompson testified at the defendant's trial that he told her on

Friday, April 18, that he was going to kill Mr. Brandenburg because he was a narc. She also stated that she saw the defendant load a gun using a handkerchief and gloves that day. She stated that he left the trailer they shared by himself sometime during daylight and did not return until after midnight. She testified that when he returned, he told her that he had killed Mr. Brandenburg and described what happened as follows:

> He pulled up in my car. I do not know the time. I know it was probably about, maybe one o'clock in the morning. And I went outside. We was at Terry Stringer's house. I went outside to see why he was gone for so long. And I went outside. He got out of my car. And I said, where the hell have you been? And he said, I went and done what I said I was gonna do. And I said, what's that? He said, I went and killed Nick. Well, then Terry walked outside and asked Nathan, did you do what you was gonna do? And Nathan said, yes, I did. And Nathan started telling how he done it. That he - him and Nick, I suppose, was in my car. I do not know if they was in my car or not. He just said they pulled up - he said, I pulled up at the place where I said I was going to take him. He did not say at that time where that was. And I -then Nathan went on to say that he told Nick to get out of the car. And they both got out. And he told Nick to bend down and look behind a log for a seed jar, something. And he said that when Nick bent down and had his back to him that - that he asked Nick, tell me now [—- F--], that you're a narc. And Nathan said, he had the gun pointed at him. And Nathan - Nick turned around to look at him and said, man what are you talking about? He said, and that's when I shot him. He said, Nick got up and started to walk off and - and he said, tell me again [—- F--], that - tell me that you're a narc. And he said Nick was saying, no man, I'm not. Let's talk about it. And he said, I shot again. And he said, he asked him again, are you a narc? Nick said, no. He said, I shot him again. He said, by that time the [—- F--] was crawling and he said that Nick looked back at him and said, man, please don't shoot me I have kids. And he said, I finished him off. And he went bam, bam, bam.

Ms. Otwell Thompson also testified that two days later, during the evening on Easter Sunday, the defendant took her and Terry Stringer to a rural location near Little River where he showed them the victim's dead body. When asked what she saw when she arrived at the location, she said:

Um, when we pulled up, they were shining a flashlight and it was on the passenger side of my car. Nathan told us to get out and Nathan said it's supposed to be around here somewhere and I was standing by my car and Nathan shined the flashlight and when he done that, it was like a pile of like logs and shrubbery and when he shined the flashlight, I seen boots sticking out from up underneath the wood. And Nathan said there was the body and Nathan and Terry walked over to it and Nathan said: Is he dead? And Terry said: Well, I guess he is. And Nathan kicked his boot and Nathan backed my car up over there to him and tied a rope to him and the rope broke and then he tied a chain to him and pulled him closer to the water and - [witness interrupted by counsel with another question].

On cross examination, she stated that although the defendant drove to the spot where the victim's body was located, neither he nor his father seemed to be giving the other instructions but that "[t]hey both seemed to both already know."

Terry Stringer also testified that on the night of Easter Sunday, his son told him that he shot Mr. Brandenburg in the shoulder. According to Terry Stringer, the defendant then drove him and Ms. Otwell Thompson in her car to a spot near Little River and showed them where the victim's body was located. He said that his son walked up to the body and "pulled a needle and a spoon out of [the victim's] pocket and put it back in his pocket." On cross examination, Terry Stringer stated that he helped the defendant dispose of the body.

Referring to April 20, 2003, the defendant testified that it was his father who told him where Mr. Brandenburg's body was located. He also stated that he never told Ms. Otwell Thompson that he killed Mr. Brandenburg.

On April 23, 2003, Jena Police Department Patrolman Jim Loe went to the trailer where the defendant and Ms. Otwell Thompson resided in response to a complaint made by Della Ann Henry, who owned the trailer. Ms. Henry testified her daughter, Tiffany Otwell Thompson, told her that Mr. Brandenburg had been missing

6

for about five days. She testified that later that day, she felt the defendant threatened her. Ms. Henry stated:

> There was a big burn on the back seat of the car. So, I went in and I went to asking her what is this? And she said that they had set a battery on the backseat and it burned a hole in the seat. And I just - I went to going off on her and telling her I didn't like the way everything was going and then I mentioned the fact - then you told me earlier about Nick [Brandenburg] missing and that's when Nathan [Stringer] looked at me and said: I know someone else who's gonna come up missing, too, if they don't shut their goddamn mouth and stay out of my business.

Ms. Henry stated that she took the threat seriously and was scared, so she filed a complaint and requested that officers remove the defendant from the trailer she owned.

Officer Loe stated that he obtained Ms. Henry's consent to search the trailer. He stated that during that search, the defendant showed him a Ruger 10-22 Rifle from the bedroom, which the defendant stated belonged to him. Mr. Brandenburg's body was found by a fisherman on April 27, 2003, floating in Little River in Grant Parish. Dean Nugent, the Grant Parish Coroner, arrived on the scene that afternoon and investigated the scene. He testified that there were no footprints in the sand near where the body had been found. Mr. Nugent stated that the body was grossly decomposed and "appeared to have basically a green, multi-colored nylon rope - what I would refer to as a ski rope - tied around, loosely around the ankles and there was a white string off of one of the wrists. I think it was the right wrist." The coroner removed the body from the water and sent it for an autopsy.

The forensic pathologist who performed the autopsy, Dr. Karen Ross, also testified that a multi-colored braided rope was found around the victim's ankle, as well as three different pieces of wire around his leg. She stated that a syringe, a small packet of cellophane and three small caps were found in one of his socks. Dr. Ross

7

testified that the cause of the victim's death was multiple gunshot wounds. She described the locations of the sixteen gunshot wounds to the victim's body as follows:

> There were 16 total. There were four on the head. There were 13 on the - actually 11 on the trunk. Nine were penetrating, that means I recovered nine bullets from the body. They went into the body and didn't exit. And then two were perforating. That means that they went into the body and then did exit. So, four on the head, 11 on the trunk, and then there was one on the wrist.

Dr. Ross stated that it was her opinion that the victim was alive at the time he sustained the gunshot wounds, because there was hemorrhaging along the paths of the bullets. She also testified that, in her opinion, the victim's death was not instantaneous, and that any or all of the bullets found in the head and trunk of the victim could have been lethal or contributed to his death. However, she stated that she could not determine the order in which the bullets were fired, nor any time frame relating to when the victim was hit with the first and last bullet.

Dr. Ross stated that she collected all the bullets and fragments from the body and sent them for testing. The bullets, along with a gun that had been found in the Defendant's home, were sent to firearms analyst Mike Stelly for examination. Mr. Stelly testified that seven bullets were recovered which were deemed to have been fired from the 22 caliber Ruger Rifle taken from the defendant's home. He also stated that four other bullets and bullet fragments had the same class characteristics, meaning the same caliber, but could not be identified to a specific gun because they did not retain sufficient individual markings for identification.

During his testimony, the defendant stated that the 22 caliber Ruger Rifle in evidence was his gun and explained the presence of bullets from his gun in the victim's body. He stated that his father took him and Tiffany Otwell Thompson to the victim's body on April 20, and that the following occurred:

A       The night we went down there and I was showed the body and all that, my daddy wanted me to help him get rid of the body and so, we tied a rope to the car and pulled him near the water. And my daddy untied him and we put him in the water and he wouldn't sink. And I was told him to shoot him to try and make him sink and I shot him.

Q       Several times?

A       Yes, sir.

He testified that he helped his father dispose of Mr. Brandenburg's body because his father asked him to and because he was scared and did not know if others were involved in the murder. He stated that Ms. Otwell Thompson's testimony was not truthful in that he did not drive to the location of the body and shine a flashlight on it, and he did not tell her that he had killed the victim. He stated that he believed she had testified as she did because she also might be afraid of others who were involved in the murder.

Officer Smith testified that although there were other suspects, the defendant was arrested based on his own statements to police, statements from others that the defendant told them he committed the act, and the connection of the bullets from the victim's body to the defendant's gun.

The State introduced evidence that after his arrest, the defendant attempted to have a note delivered to his father, who was in another section of the same jail. The defendant testified that he wrote the note, which was intercepted by officers. The note states, in pertinent part, "I haven't said anything about you. I did about Donald Lee its [sic] all on him."

The evidence presented by the State, through the testimony of its several witnesses, conflicts with the testimony given by the defendant. The State's witnesses testified that the defendant was the last person with whom the victim was seen alive,

9

that the defendant said he was going to "take care" of the victim while loading his gun, that the defendant later admitted to killing the victim and that he took Ms. Otwell Thompson and his father to the body two days later to attempt to sink it in the river. The defendant, however, testified that he and the victim were friends and that he left the victim with his father, who later took Ms. Otwell Thompson and him to the body and ordered him to help dispose of it. The jury obviously based its verdict upon its determination of the credibility of the witnesses. As previously stated, credibility assessments are within the province of the factfinder, which was the jury in this case. A jury may "accept or reject, in whole or in part," the testimony of any witness. *State v. Rubin,* 04-1531, p. 5 (La.App. 3 Cir. 4/6/05), 899 So.2d 180, 183, *writ denied*, 05-1218 (La.12/16/05), 917 So.2d 1106. Clearly, the jury believed the version of events presented by Ms. Otwell Thompson and Terry Stringer over the account presented by the defendant.

This version was supported by Dr. Ross' testimony regarding the physical evidence. The defendant's account of shooting into the victim's dead body was negated by Dr. Ross' testimony that the victim was alive when he was shot. Also, Dr. Ross testified that the cause of death was the multiple gunshot wounds. In sum, while he offers numerous other potential suspects and theories, the defendant's brief offers no concrete reason why the jury's conclusion should be considered unreasonable.

Under the *Jackson* standard of review, the jury's credibility determination will not be reversed by this court. Any rational finder of fact could have found that the evidence, viewed in the light most favorable to the prosecution, was sufficient to prove the defendant killed Mr. Brandenburg and thus was guilty of second degree murder. Consequently, we find that this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO:

For his second assignment of error, the defendant alleges that the trial court prevented him from calling any impeachment witnesses and from making effective cross examination, thus denying his Sixth Amendment right to confrontation and to present a defense. The defendant argues that he was prevented from presenting evidence relating to other possible perpetrators, who the defendant alleges were involved in a methamphetamine manufacturing business with the victim and had who had previously threatened his life.

*Other threats & victim's drug involvement*

We begin with the defendant's argument that he was prevented from asking about the victim's involvement in a methamphetamine manufacturing ring. The defendant alleges in his brief to this court that Donald Lee Chevallier, Bo Franklin, Terry Stringer, the defendant and the victim all manufactured methamphetamine together. The defendant alleges that the other members of the group believed that the victim had told police about their activities and had threatened his life, offering a reward for his death.

The defendant points specifically to an exchange that took place during Officer David Smith's testimony. Defense counsel asked Officer Smith if other possible suspects were investigated. Officer Smith stated that Donald Lee Chevallier, Terry Stringer and Bo Franklin and his wife, Lisa Franklin, were all considered for potential involvement in the crime. Officer Smith stated that his investigation revealed that Mr. Chevallier and Mr. Franklin had both made threats on the victim's life. He said that the other suspects had not been ruled out, but that there was sufficient evidence to arrest the defendant for the crime. When asked whether he was able to ascertain

11

whether the victim had been involved with the manufacture of methamphetamine, the State objected based on relevancy and the following discussion occurred outside of the jury's presence:

THE COURT: Okay. The question was an elusion [sic] to an investigation done by the witness that indicated that the decedent was involved in the manufacture of crystal meth. Is that correct?

MR. KUTCH [Defense Counsel]: That is correct, Your Honor.

THE COURT: The objection was relevance. Correct?

MR. WALTERS [Assistant District Attorney]: Correct.

THE COURT: Particularly?

MR. WALTERS: What's that got to do with whether or not Nathan Stringer committed this murder? How is that gonna help this trier of fact reach the conclusion or the decision in the ultimate issue?

MR. KUTCH: The investigation indicated that Mr. Brandenburg was involved with some type [sic] of the individuals named by the officer as possible reasons the - my further questions, Your Honor, involved that he had received reports of actual threats of death against Mr. Brandenburg in - because of his - all of - all of their involvements in the- in the manufacture. That's what this killing was all about.

THE COURT: Well, I don't think that - I don't think right now that the question to the witness and the response is relevant. Now, while it is true that the defense can develop whatever theories possible, you're still gonna have to - you're still gonna have to develop it with competent evidence. The question for this witness would be what evidence, I guess, that he has to support that. I mean, you know, there's been no bill of information filed. There's been no evidence of any other investigation of the decedents involved but in this or anything like that. So, as of the present time, I would think that there's not really a predicate for it being relevant.

MR. WALTERS: And I might add moreover that if that door is opened, then I get to come back and talk about the defendant's involvement in the aspect of this manufacturing stuff. I have been very meticulous, I have instructed all of my witness - you recall Officer Jim Loe and Scott McLendon's testimony this morning. They simply said: We were out there to investigate a matter. The truth was, - well, not the truth, but the whole of the statement was what Ms. Henry had asked him to do was go get him out of there and get them drugs out of my house.

12

In fact, they found stuff when they went out there. So, I have been very careful to stay away from it. But, if it's open, I'm gonna go into it.

THE COURT: Well, I would think that - giving all of that, I don't know how much really the defendant wishes to pursue that. Because if we've got a pot and a kettle and a fire and, you know, and a spoon and a filter and - you know, then sometimes the tar baby sticks. But, for right now concerning this particular objection, I don't think that it's relevant right now and I don't really think that the witness is competent to answer the question that you posed. Now, you can develop any theory you want. That's no problem. But for right now I'm gonna sustain the relevancy objection. Okay?

Criminal defendants are guaranteed the right to present a defense by both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution. However, this right does not require a trial court to permit evidence that is deemed irrelevant. *See* La.Code Evid. art. 402. ("Evidence which is not relevant is not admissible.") Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. Relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or waste of time. La.Code Evid. art. 403. "The trial court's determination regarding the relevancy of evidence offered is entitled to great weight and should not be overturned absent a clear abuse of discretion." *State v. Recard*, 97-754, p. 4 (La.App. 3 Cir. 11/26/97), 704 So.2d 324, 327, *writ denied*, 97-3187 (La. 5/1/98), 805 So.2d 200.

Louisiana Code of Evidence Article 404 concerns character evidence, generally and as it relates to other crimes, wrongs or acts, stating the following:

  **A. Character evidence generally.** Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for

13

the purpose of proving that he acted in conformity therewith on a particular occasion, except:

**(1) Character of accused.** Evidence of a pertinent trait of his character, such as a moral quality, offered by an accused, or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.

**(2) Character of victim**. (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible; or

(b) Evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

**(3) Character of witness.** Evidence of the character of a witness, as provided in Articles 607, 608, and 609.

**B. Other crimes, wrongs, or acts.** (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged,

evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.

In the instant matter, the defendant asserts in his brief to this court that "[i]t was central to the State's theory that Nick was killed because of a rumor that he was a 'narc'." He additionally argues that "[his] defense was misidentification[,]" because, "[a]lthough he may have been an accessory after the fact, or even a co-conspirator, he did not commit the crime."

The second circuit considered a similar argument in *State v. Wade*, 33,1221 (La.App. 2 Cir. 5/15/00), 758 So.2d 987, *writ denied,* 00-2160 (La. 9/28/01), 797 So.2d 684. In *Wade*, following his conviction for second degree murder, the defendant argued that he should have been able to introduce evidence that the victim sold drugs. The victim was killed in his apartment, which had been robbed of more than a thousand dollars in cash and jewelry. The defendant asserted that the robbery and murder were the result of a drug deal, and presented an offer of proof from the victim's girlfriend wherein she stated that the victim's only source of income was from the sale of marijuana. The trial court found the testimony to be an impermissible attack on the victim and found that the prejudicial effect of the evidence outweighed any potential probative value.

15

The second circuit found that the testimony "somewhat support[ed]" the defendant's theory that the murder was a result of a drug deal and not merely a robbery, stating:

> Rather than merely being an unfair attack on the victim's character, this statement can be construed as relevant, admissible evidence. And, in fact, the defendant was not making an attack on the victim's character as in the hostile demonstration/overt act self-defense claims. In those cases and homicide cases generally, an attempt is frequently made, which La.C.Cr.P. art. 404 prohibits, to paint the victim as a bad person deserving his fate, death at the hands of the defendant. However, this is not necessarily the case here. The defendant, although he did seek to introduce evidence which reflected badly on the victim, did so arguably to support his story of the events that led to the victim's death. The allegation of the victim's girlfriend that the victim dealt in drugs could have made it marginally more arguable that his death arose out of that conduct, instead of a house-jacking robbery. This is so, even though she could not, apparently, say the victim was peddling drugs on the night of his death.

*Id.* at 996. However, the court continued to find that any error the trial court may have made in excluding the evidence was harmless when examined in light of the entire record. The court reviewed seven pieces of evidence in the record which would be cumulative to the excluded testimony. A few of those items included the defendant's numerous changes to his story, discrepancies between the defendant's account and physical evidence, and "[a]mple testimony in the record (marijuana, cash and jewelry) for a reasonable juror to infer that the victim was involved in the drug trade[.]" *Id.* Consequently, the court found that there was not an appreciable chance that the fact that the evidence was withheld would have contributed to the defendant's conviction.

In the present case, the trial court made its ruling in response to a question regarding whether Detective Smith was able to ascertain whether the victim was involved with a manufacturer of methamphetamine. When defense counsel argued

16

that the threats had come from other alleged manufacturers, the trial court stated that the defense could develop any possible theories, but that there had not been a sufficient predicate for an answer to that question at that time. After the discussion above, the detective testified that both Donald Lee Chevallier and Bo Franklin had made specific threats to kill the victim and that they had not been ruled out as possible suspects. The detective additionally testified that he did not know Mr. Chevallier's whereabouts.

Based on the trial court's statements above, the court's sustaining of the objection did not prevent the defendant from presenting his theory relating to threats by other individuals involved with the victim in a drug ring. The trial court's statement reflects a finding that there had not been formal charges made in regard to the alleged methamphetamine manufacturing ring and thus the witness, who was a police detective, would not likely have first-hand knowledge of the victim's level of involvement in such an operation. Although the State asserted a potential trial strategy should such evidence be admitted, the statements were made outside of the jury's presence and the trial court subsequently stated that it would allow the defense to pursue any potential theories. Moreover, the jury still heard testimony regarding the threats and the continued investigation of Mr. Chevallier and Mr. Franklin, which would tend to support the defendant's theory. Therefore, we find that the trial court did not abuse its discretion in finding the evidence irrelevant.

The defendant offered testimony from Francis Breland relating to her perceptions of the victim's demeanor on Friday, April 18, 2003. The defendant suggests on appeal that such testimony was relevant because it contradicts Ms. Otwell

Thompson's testimony that the defendant loaded his weapon and told her that day he was going to kill the victim.

The State initially offered an objection to the relevance of Ms. Breland's testimony. Defense counsel argued that the witness would testify that the victim appeared calm and was at ease with the defendant during a visit to her home on Friday afternoon. After a short discussion with the trial court, the attorneys settled on the matter and the State withdrew its objection. Ms. Breland then testified that Mr. Brandenburg was not ill at ease and did not appear to be frightened when he was at her house Friday afternoon. Although the State objected to the witness' next answer, defense counsel agreed with the State and said that he thought the answer went beyond the scope of the question. Accordingly, defense counsel asked that the answer be stricken from the record.

Consequently, Ms. Breland was permitted to testify regarding her perception of the victim's behavior on April 18. The Defendant's argument with regard to this issue is without merit.

*Defendant's relationship with his father*

The defendant attempted to offer testimony describing his relationship with his father to support his theory that it was his father who had taken him to the body and instructed him to dispose of it, and not the other way around as Ms. Otwell Thompson and Terry Stringer had testified. During the discussion relating to the State's relevance objection, defense counsel argued that he would call a number of witnesses who would state that Terry was the one who told the defendant what to do, and that Terry would never take directions or orders from the defendant. When the State alleged that constituted improper character evidence, defense counsel argued that

18

such evidence would relate to a habit or custom between the defendant and his father.

The defendant proffered testimony from his mother and two other individuals, whose testimony corresponded to his counsel's statements.

Although character evidence is generally inadmissible when offered circumstantially, evidence that demonstrates an individual's habit or routine practice may be deemed relevant to prove an individual acted in conformance with that habit. La.Code Evid. art. 406; *See* Comment (b). "A habit or routine practice is very specific and must be nearly invariable and semi-automatic." *State v. Flowers*, 574 So.2d 448, 452 (La.App. 2 Cir.), *writ denied,* 580 So.2d 666 (La.1991), (citing La.Code Evid. art. 406, Author's Note (1); McCormick on Evidence § 195 (3d ed. 1984)).

In the instant matter, defense counsel argued the following in support of the testimony:

> The habit is that in any situation given between Terry and Nathan Stringer, Terry was the mover and the shaker. He was the one that gave the directions and he didn't brook any interference. He told how things were gonna be. And that was it.

The defendant attempted to introduce the evidence to show Terry Stringer's domineering nature with his son. However, evidence of a father's domineering nature demonstrates a character trait of the father, and not necessarily a habit or specified, routine practice between the men.[1] Additionally, we note that the testimony of Ms. Otwell Thompson and Terry Stringer, as reviewed above, was that the defendant took them to the victim's body. Contrary to the defendant's argument that the evidence was a necessary rebuttal, our review of the record does not reflect that either witness

---

[1] *See, e.g., State v. Davis,* 92-1623 (La. 5/23/94), 637 So.2d 1012*, cert denied,* 513 U.S. 975, 115 S.Ct. 450 (1994).

19

testified that the defendant instructed Terry Stringer to help dispose of the body. Consequently, we find that the trial court did not abuse its discretion in ruling that the nature of the relationship between the Defendant and his father did not rise to the level of a "habit" under La.Code Evid. art. 406.

For all of the reasons stated above, this assignment also lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE:

In his final assignment of error, the defendant claims that his trial counsel was ineffective in numerous regards, listing twenty subdivided arguments. We have grouped the defendant's claims by the type of error alleged, but will refer to the defendant's numeration system for clarity.

The Louisiana Supreme Court has explained the following standard and considerations for a defendant's claim that his counsel provided ineffective assistance:

> A criminal defendant is guaranteed the effective assistance of counsel. United States Sixth Amendment; La. Const. art. I, § 13; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Washington*, 491 So.2d 1337 (La.1986). To establish a claim of ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. *Strickland v. Washington, supra; Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." *State v. Ratcliff,* 416 So.2d 528, 531 (La.1982).

> A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. *E.g., State v. Prudholm,* 446 So.2d 729 (La.1984). However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate. *E.g., State v. Hamilton,* 92-2639 (La.7/1/97), 699 So.2d 29, 32-35.

20

*State v. Bright*, 98-398, pp. 40-41 (La. 4/11/00), 776 So.2d 1134, 1157.

*Failure to Subpoena a Witness - Defendant's arguments: 2-8, 14(a)*

The defendant alleges that trial counsel failed to subpoena multiple witnesses whose testimony, he asserts, would have supported his hypothesis that it was Donald Lee Chevallier, Bo Franklin and/or Terry Stringer who actually killed Nick Brandenburg. In his brief to this court, he argues that trial counsel's performance was deficient because he failed to subpoena numerous witnesses.

The record contains insufficient information for this court to determine whether the defendant's trial counsel was ineffective in this respect. The defendant accurately stated in his appellate brief that the investigating officers took numerous statements in the instant matter. Although they were not admitted at trial, these statements are included in the State's discovery which appears in the appellate record. However, the record does not contain defense counsel's testimony concerning the reasons for his actions and the strategy he had undertaken. "The election to call or not to call a particular witness is a matter of trial strategy and is not *per se* evidence of ineffective assistance." *State v. Washington*, 00-1312, p. 18 (La.App. 5 Cir. 5/16/01), 788 So.2d 596, 607, *writ denied,* 01-1718 (La. 5/3/02), 815 So.2d 94; *State v. Dixon*, 25, 671 (La.App. 2 Cir. 1/1/9/94), 631 So.2d 94.

Many of the statements included in the police reports and hypotheses alluded to by the defendant include references to participation by him, his relatives or close friends in illegal activities including drug manufacture and use, physical violence and kidnaping, possession and discharge of weapons, and other offenses. The record does not indicate whether defense counsel met with these witnesses or discussed their testimony with the defendant as part of a determination to forestall their exposure to

21

the State's cross-examination. Defense counsel may have also considered the credibility of certain witnesses whose testimony was not subpoenaed for trial or the reasonableness of each individual story told and how that account would relate to an overall trial strategy. An evidentiary hearing, conducted as part of the post-conviction relief process, would allow the lower court to develop a full record on this matter including whether the defendant himself was aware of any potential strategy and acquiesced in it. Any attempt to analyze the trial counsel's performance regarding the numerous potential witnesses without such a record would be purely speculative. "Professional counsel should not be branded 'ineffective' based upon mere speculation, nor should a duly tried defendant obtain relief on such a basis. Counsel's trial strategy is more properly addressed in a post-conviction proceeding." *State v. Bazar*, 99-752 pp. 3-4 (La.App. 3 Cir. 2/2/00), 758 So.2d 844, 845 (citing *State v. Guillory*, 95-383 (La.App. 3 Cir. 1/31/96), 670 So.2d 301).

*Failure to Get a Stipulation - Defendant's argument: 7*

The defendant also alleges that:

[d]efense counsel failed to subpoena the FBI examiner, get a stipulation to the report, or ask the leading officer about test results showing that the speaker wire in the car was the same kind of speaker wire on the body but that it was not cut from the rolls found in the car . . . and that there were no fibers found that connected Nick [Brandenburg] with Nathan [Stringer] or the car.

As above, defense counsel's decision not to subpoena an investigator regarding the reports may have been part of counsel's trial strategy which would be properly considered by an evidentiary hearing as part of the post-conviction relief process.

*Failure to Subpoena Records - Defendant's argument: 9*

The defendant alleges that defense counsel failed to subpoena the telephone records for both himself and his father for April 18, 2003. The State included in its

22

discovery a subpoena for the records relating to the defendant's cell phone from February 1, through April 28, 2003. The State also included a letter from the cell phone provider, which states that "The number/s or customer/s are not active for the time period given." We did not locate any other subpoenas relating to cell phone records in the State's discovery.

As previously discussed, claims of ineffective assistance are more properly raised in an application for post-conviction relief where an evidentiary hearing can be held by the trial court unless the record contains sufficient evidence to address the issue on appeal. As to this claim, there is not enough evidence in the appellate record to allow such review. The defendant testified regarding the alleged call from his father on April 18, stating that he parted with the victim on that day "[w]hen my daddy called me on the cell phone." He did not state that he used a cell phone other than his own. However, the defendant seems to suggest in his appellate brief that he used a different phone to call his father on April 18.

It is unclear which phone was used, and the defendant does not allege whether defense counsel knew. If he did, it is possible that trial counsel decided against such a subpoena as a matter of trial strategy. These claims should be raised in an application for post-conviction relief where an evidentiary hearing on defendant's claim can be conducted.

*Failure to Object to Testimony - Defendant's arguments: 10, 19*

The defendant alleges ineffective assistance of counsel for failure to adequately object to testimony presented by Della Henry and Detective David Smith. As to Ms. Henry, he alleges that her testimony that he threatened her on April 23 was "a

23

prejudicial, inadmissible other crime or bad act that the State used to impugn Nathan's character[,]" and trial counsel should have objected to it.

Ms. Henry did not state in her testimony the date in which the statement was made, only that it was made during the month of April. She stated that she filed a complaint at the courthouse and met with Officer Loe on April 23, 2003, but did not specify whether that was the date the statement was made.

The State suggested in its closing statement and in its brief to this court that the evidence was submitted to demonstrate that the defendant did, in fact, know that the victim was missing when he made that statement and that knowledge linked him to the crime. The defendant, however, argues in his brief to this court that "the evidence showed that nearly everyone knew Nick was missing by April 23," when he alleges the statement was made.

While the defendant does not specify the identities of "everyone" who knew of the victim's disappearance, Tiffany Otwell Thompson, Terry Stringer, and the defendant himself each testified that they saw the victim's body on the evening of April 20, 2003. It is unclear whether the statement was made during the weekend of Friday, April 18, 2003, before the attempt to dispose of the body was made, or after Sunday, when at least three people had seen the victim's body. That fact could have played an important part in trial counsel's decision whether to challenge the admission of the evidence. Therefore, this issue would be more properly considered following an evidentiary hearing, through post-conviction relief.

The defendant next alleges that trial counsel should have objected to Detective Smith's testimony because the detective gave "his opinion on the defendant's guilt, particularly based on what persons who did not testify told him."

We have reviewed Detective Smith's testimony and are unable to identify any statements in which he provided a personal opinion regarding the defendant's guilt or innocence. On the page the defendant references in his brief, the following exchange took place:

Q    Okay. And based upon the investigation you conducted, why are we here with Mr. Nathan Stringer?

A    We had enough evidence to place him under arrest for the actual crime.

Q    All right. And what would that evidence be that caused you to lead you [sic] to make that statement?

A    The would've been statements that were taken and evidence collected.

Q    Tell us what that evidence was. Why did you do what you did?

A    The - we have statements from persons that say Mr. Stringer told him that he committed the act. We also have the weapon there which is connected with the fragments and bullets recovered from Oliver Nick Brandenburg's body.

Detective Smith noted that there were other suspects investigated and then was asked to describe the evidence which formed the basis of his arrest of the defendant. Although the detective testified that he considered statements, he also considered other physical evidence in arresting the defendant.

The detective's statements regarding the basis of the defendant's arrest did not amount to a personal opinion of the defendant's culpability for the underlying crime charged. Consequently, based on the *Strickland* standard outlined above, we find the defendant has not demonstrated that trial counsel's failure to object to Detective Smith's testimony regarding the defendant's arrest fell below an objective standard of reasonableness under prevailing professional norms or that any omission he made resulted in prejudice so great as to undermine confidence in the outcome of the trial.

*Failure to Object to Admission of Gruesome Photographs - Defendant's argument: 20*

The defendant asserts that trial counsel "failed to object to the admission of gruesome photographs of the [victim's] body, particularly where the intentional killing was not at issue."

The Louisiana Supreme Court considered a similar issue in *State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, stating:

> The State is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location, and placement of wounds, and to provide positive identification of the victim. *State v. Koon*, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776 (orig.hrg); *State v. Maxie*, 93-2158 (La.4/10/95), 653 So.2d 526, 532, n. 8, *citing State v. Martin*, 93-0285, p. 14 (La.10/17/94), 645 So.2d 190, 198; *State v. Watson*, 449 So.2d 1321, 1326 (La.1984), *cert. denied* 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors reason and leads them to convict without sufficient other evidence. *State v. Koon, supra*, (citing *State v. Perry*, 502 So.2d 543, 558-59 (La.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987)).

*Id.* at 564-65.

As in *Hoffman*, the crime scene photographs in the instant matter were relevant to show the manner of death and the location of the victim's body. As discussed above, Tiffany Otwell Thompson testified that the defendant told her that he shot the victim multiple times. Terry Stringer testified that the defendant told him that he shot the victim in the shoulder. Additionally, Ms. Otwell Thompson, Terry Stringer and the defendant each testified with varying accounts of the events of Sunday, April 20, when the men attempted to move the victim's body. Consequently the photographs were probative of issues raised during trial and the defendant does not demonstrate any specific prejudice from their admission.

Consequently, based on the *Strickland* standard, the defendant has not demonstrated that trial counsel's failure to object to their admission fell below an objective standard of reasonableness under prevailing professional norms or that any omission he made resulted in prejudice so great as to undermine confidence in the outcome of the trial.

*Failure to Prepare for Testimony and/or Cross Examine Witnesses - Defendant's arguments: 1, 11-14*

The defendant alleges numerous instances where trial counsel was deficient in his examination of witnesses. In the first instance, the defendant suggests that trial counsel failed to question Tiffany Otwell Thompson regarding three telephone calls that he alleges she made to the defendant on Friday, April 18, 2003. He argues that if Ms. Otwell Thompson had not testified that someone other than the defendant answered one of the calls, defense counsel should have asked Nickie Brown to impeach her testimony. Beyond those general statements, the defendant does not present any argument regarding why such testimony would have been relevant or how it could have potentially influenced the jury's verdict. Consequently, we find that the defendant has failed to demonstrate that he suffered any prejudice from this alleged misconduct by his trial counsel, as required for a claim of ineffective assistance of counsel to succeed. *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.

The defendant also alleges that "[a]lthough the State filed a Notice of Intent to use co-defendant's statements and another Notice of Intent to use other witnesses defense counsel was not prepared to cross examine those witnesses with their prior statements" or generally, about a list of eight specific matters. All of these issues concern questions that the defendant argues should have been posed to either Tiffany Otwell Thompson or Terry Stringer.

27

It is impossible to discern trial counsel's level of pre-trial preparation from the record. Trial counsel engaged in an extensive cross-examination of Ms. Otwell Thompson and Terry Stringer. However, it would be imprudent to speculate as to the amount of preparation trial counsel engaged in prior to these examinations or the reasons for engaging the witnesses in certain areas of testimony and not others. These reasons could have fallen within the ambit of trial strategy. *See State v. Collins*, 04-1441 (La.App. 3 Cir. 3/2/05), 896 So.2d 1265, *writ denied,* 05-1334 (La. 1/9/06), 918 So.2d 1040. Accordingly, this issue would be more properly addressed in an application for post-conviction relief.

The defendant also alleges that trial counsel failed to cross examine both the coroner and the forensic pathologist regarding the condition of the victim's body when it was found and the weather conditions at the time, which would have helped determine the date and time of death.

With regard to the coroner, Mr. Nugent testified that he came upon the victim's body floating in a body of water. He stated that the body had undergone "pretty gross decomposition" such that there was concern that the body would tear if pulled from the water, so he had to enter the water and ease the body onto a body board and float it to the bank. He noted a number of "defects" on the body which he suspected to be gunshot wounds, which he stated was the reason that he ordered an autopsy. He stated that there was a "tentative identification" of the body made at the scene, but that a slime on the body, decomposition and sloughing of the skin hindered that process. He stated that the body was sealed in a body bag and sent to the pathologist's office.

Based on this testimony, this court does not find that defense counsel's performance was insufficient for failure to ask whether the body appeared to have been dragged up and down a road or had wounds which appeared to be from a drill or knife. Mr. Nugent stated that the body had undergone too much decomposition for much handling. He also stated that upon noticing the wounds, his standard procedure was to request an autopsy. He did not suggest that it would be standard for him to attempt to ascertain the cause of wounds to the body. Accordingly, we find that it is possible that the coroner may not have been able to answer to such questions and trial counsel may have chosen not ask them of this witness as a matter of trial strategy. Therefore, such a claim would be more properly addressed through post-conviction relief.

With regard to the pathologist who conducted the autopsy, the defendant argues that trial counsel should have asked whether the body appeared to have been dragged or had chain marks, whether the wounds appeared to have been caused by a drill bit or a knife, whether the order and angle of the gunshots could be determined and if any appeared to be inflicted post-mortem and whether the date of death could be determined.

In her testimony, Dr. Ross explained that areas of hemorrhaging, or bleeding, were found along the paths of the gunshot wounds. She also testified that the moderate to advanced decomposition of the body complicated the examination of the gunshot wounds because the body had begun to break down in addition to the hemorrhaging. However, she testified that the hemorrhaging did lead her to believe that the victim was alive at the time he sustained the gunshot wounds, but that he did not die instantaneously. In his cross examination, trial counsel asked Dr. Ross

extensively about the type of bullets, the weapon they would likely be used with, and likely damage that they would cause to a person. Additionally, defense counsel asked her if the victim was likely alive at the time he received "all of the wounds[,]" and the doctor stated that he was. The following series of questions were asked next by defense trial counsel:

Q    Can you tell me a time frame from the first bullet wound to the last?

A    No. I cannot.

Q    Can you tell me from the - a time frame from the last bullet to how long it would have taken him to die?

A    I would say minutes. But it could have been some number of minutes. And that's as precise as I can be really.

Q    Is it possible for him to have received several of the wounds and then a time frame passes and more and more bullets were fired into him? And he still been alive?

A    I can't say that definitively. I just - I don't have anything that makes me think that any of the gunshot wounds were different appreciably from what I could tell at the time of autopsy. And specifically I mean, I can't say if some were fired before others. All's I can tell you is he was alive at the time he sustained those injuries and that he had a vital - that means he had a vital response where he's bleeding.

Q    You can't give me a time frame?

A    No.

Q    Would the fact of the condition at the body at the time use or contribute greatly to your inability to make that kind of assessment?

A    Even if there wasn't decomposition, that would be very difficult but the decomposition definitely did complicate the ability to interpret some of the findings associated with the gunshot wounds.

30

Defense counsel did ask the doctor some of the exact questions the defendant argues to this court should have been presented to her. The defendant's argument on appeal is that trial counsel should have questioned the pathologist regarding his account that he saw the victim after he was dead, shot at the dead body and attempted to drag it to the water. On cross examination, defense counsel asked whether the doctor could assess how the victim died and whether the bullets were fired into him post-mortem. Consequently, we find that defense counsel thoroughly examined the pathologist regarding this theory and that his performance with regard to this witness did not fall below an objective standard of reasonableness which resulted in prejudice sufficient to undermine confidence in the trial's outcome.

Finally, the defendant alleges that trial counsel failed to cross examine Detective David Smith regarding numerous pieces of information that appear in the State's discovery. The questions the defendant alleges the detective should have been asked principally concern his contention that Donald Lee Chevalier, Bo Franklin, Terry Stringer or somebody else committed the murder or put out a contract to pay someone else to do it.

As previously noted with regard to issuing subpoenas to witnesses to flesh out the same theories, this issue would be more properly raised through post-conviction relief. As discussed above, the record contains a significant number of interviews and other documentation within the State's discovery. These interviews contain numerous accounts which implicate various individuals either in Nick Brandenburg's death or other crimes including drug manufacture and distribution, weapons possession, kidnaping, solicitation for murder and other offenses. During his cross examination, trial counsel asked the detective about the other potential suspects and

threats made by those suspects on the victim's life. Given the subject matter and nature of much of this information, it would be little more than pure speculation for this court to attempt to discern trial counsel's reasons for examining Detective Smith about some of items referenced in State's discovery and not others. A full evidentiary hearing in connection with the post-conviction relief process would provide trial counsel the opportunity to elaborate on whether his decision to not include certain theories in his cross examination of Detective Smith was part of an overall trial strategy, and possibly whether the defendant knew of such strategy. Consequently, this subject is also more properly considered through post-conviction relief.

*Failure to Request Special Jury Instruction - Defendant's argument: 15*

The defendant asserts that trial counsel failed to request a special jury instruction regarding the testimony of Tiffany Otwell Thompson and Terry Stringer, who he alleges should have been identified as accomplices. There is sufficient information in the record to consider this claim using the two-part *Strickland* test.

> Regarding the potential jury instruction, our brethren on the Fifth Circuit have stated: "While the testimony of a co-defendant in a crime should be received with a great deal of caution, a jury or judge may nonetheless convict on this testimony if it is deemed sufficient. *State v. May*, 339 So.2d 764, 775 (La.1976)." State v. Addison, 00-1730, p. 8 (La.App 5 Cir. 5/16/01); 788 So.2d 608, 614. The footnote to this passage elaborates:

> > See also: *State v. Howard*, 98-0064 (La.4/23/99), 751 So.2d 783, 801, *quoting State v. Schaffner*, 398 So.2d 1032, 1035 (La.1981), where it was held that when the state's case turns upon the uncorroborated testimony of an accomplice, the trial judge should instruct the jury to treat such testimony with great caution. However, when the accomplice's testimony is corroborated by other evidence, such language is not required.

> *Id.* at 614, n. 4.

*State v. Zeno*, 01-1340, pp. 9-10 (La.App. 3 Cir. 3/13/02), 811 So.2d 1222, 1229, *writ denied,* 02-1051 (La. 11/15/02), 829 So.2d 423.

Regarding the level of corroboration necessary, this court has stated that a "great caution" instruction regarding accomplices is not necessary where there is material corroboration of an accomplice's testimony. *State v. Chesson*, 03-606 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686. "Testimony is materially corroborated 'if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation.'" *Id.* at 186 (quoting *State v. Schaffner*, 398 So.2d 1032, 1035 (La.1981)).

In the instant matter, the testimony given by Ms. Otwell Thompson and Terry Stringer at the defendant's trial was corroborated. As shown in the recitation of facts and the *Jackson* sufficiency review, the witness' testimony was corroborated by each other, as well as by other witnesses and physical evidence.

Both Ms. Otwell Thompson and Terry Stringer testified that the defendant told them that he took the victim to the rural area and shot and killed him. Despite the defendant's attempt to distinguish the details of their accounts in his appellate brief, their testimony was consistent, although Ms. Otwell Thompson knew more details surrounding the actual shooting. Although neither witness testified regarding the number of gunshots to the victim, the forensic pathologist testified that most of the shots were to the torso and head. As previously referenced, Terry Stringer said that the defendant pointed to his shoulder when explaining where he shot the victim. Additionally, both witnesses testified that they went with the defendant to where the victim's body had been left and the men attempted to drag it into a nearby lake.

Finally, the forensic pathologist testified that a syringe and spoon were found in the victim's person. This testimony would corroborate Terry Stringer's statement that when they went to move the body, he saw the defendant pull a needle and spoon from the victim's pocket and replace it.

Although the defendant argues that Ms. Otwell Thompson provided multiple statements to police which contained different accounts of her stories and Terry Stringer made a deal with prosecutors in exchange for his testimony, these pieces of information were both presented to the jurors. Additionally, Ms. Otwell Thompson testified that her statements had changed because she was concerned she would go to jail or lose custody of her child due to the incident. Credibility determinations rest with the jury who, as the trier of fact, may accept or reject the testimony of any witness in whole or in part. *State v. Hammock*, 97-1164 (La.App. 3 Cir. 4/1/98), 711 So.2d 756, *writ denied*, 98 -1143 (La. 9/25/98), 726 So.2d 11.

The aforementioned evidence materially corroborates the testimony of Tiffany Otwell Thompson and Terry Stringer. Consequently, trial counsel lacked a valid legal basis for requesting a "great caution" accomplice jury instruction. His performance, therefore, was not deficient under the first prong of the *Strickland* analysis. This argument lacks merit.

*Failure to File Motions - Defendant's arguments: 16-17*

The defendant alleges that trial counsel's performance was deficient due to his failure to file a Motion to Suppress the evidence found in the search of the mobile home and car, and to suppress statements he made to police officers throughout the course of their investigation.

34

With regard to the evidence obtained in the search of the mobile home and car, the defendant alleges that neither Della Harvey nor Tiffany Otwell Thompson had authority to consent to those searches, so trial counsel should have filed a Motion to Suppress. The defendant makes no further argument. As previously noted, a defendant must to show not only deficient performance, but he also must demonstrate that the deficient performance caused prejudice in his case. *See State v. Davis*, 05-543 (La.App. 3 Cir. 12/30/05), 918 So.2d 1186. The defendant makes no such demonstration. .

With regard to the statements that he made to police during the course of the investigation, the defendant testified at trial that he made five separate statements to police in 2003 on April 24, April 28, May 1, May 9, and May 19. In his appellate brief, he argues that he was appointed counsel after his arrest on April 23 and alleges that he invoked his right to counsel during the May 9 interrogation. We have reviewed the record and are unable to determine when counsel was initially appointed to the defendant. Consequently, this issue would be properly raised through post-conviction relief, where a full evidentiary hearing may be held.

Regarding the defendant's claim relating to the May 19 interrogation, we find that even if this court were to accept the defendant's argument, he has not demonstrated how trial counsel's alleged failure to move to suppress that interrogation prejudiced his case. The defendant alleges that the State "used the [May 19] statement against him at trial." He has not alleged how the statement was used, particularly with regard to which information from that particular statement was used that did not appear in any of the four other statements. Therefore, the defendant has failed to demonstrate how trial counsel's performance in failing to file a Motion to Suppress

the evidence retrieved in the search or his statements to police fell below a general standard of competence as required by *Strickland*. Consequently, this argument is, likewise, without merit.

*Failure to Require Use of Full Statements - Defendant's arguments: 18*

The defendant alleges that:

> Defense counsel failed to invoke the requirement of Revised Statute 15:450 that requires that a defendant's statement be used in full; instead the State was allowed to use selected, out-of-context pieces of Nathan's statements and counsel did nothing to rehabilitate or complete the use of the statement. Any concern about revealing the drug issues in this case could have been addressed pre-trial and were irrelevant given the testimony that Nick['s] death was related to the 'narc' rumor.

Louisiana Revised Statutes 15:450 states that "[e]very confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."

The defendant failed to demonstrate which aspects of which statements were actually used at trial. As previously noted, the defendant provided numerous statements to officers during the course of the investigation. Further, the defendant took the stand in his own defense during the trial. It is impossible to determine whether trial counsel, as a matter of trial strategy, intended for the defendant to refute any parts of the statement which were referenced, and whether the defendant himself may have been aware of such a strategy if it existed. Therefore, this Court is not in a position to determine whether trial counsel's performance was deficient in this regard. The Defendant should seek post-conviction relief with the trial court regarding this issue if he so chooses.

## CONCLUSION

The defendant's conviction is affirmed.

**AFFIRMED.**