# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**09-1260**

STATE OF LOUISIANA

VERSUS

VINCENT MARINELLO

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 119805
HONORABLE CORNELIUS EDWARD REGAN, DISTRICT JUDGE, AD HOC

**********

## MARC T. AMY
## JUDGE

**********

Court composed of John D. Saunders, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**Paul Connick, Jr.**
**District Attorney**
**Jefferson Parish**
**Thomas Block**
**Assistant District Attorney**
**Andrea F. Long**
**Assistant District Attorney**
**Vincent Paciera, Jr.**
**Assistant District Attorney**
**Juliet Clark**
**Assistant District Attorney**
**Roger W. Jordan**
**Assistant District Attorney**
**Jay W. Adair**
**Assistant District Attorney**
**200 Derbigny Street**
**Gretna, LA   70053**
**(504) 368-1020**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, LA   70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Vincent Marinello**

**Carey J. Ellis, III**
**Louisiana Appellate Project**
**707 Julia Street**
**Rayville, LA   71269**
**(318) 728-2043**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Vincent Marinello**

**Vincent Marinello**
**Cypress - 2**
**Louisiana State Prison**
**Angola, LA   70712**

AMY, Judge.

A jury convicted the defendant of second degree murder following the shooting death of his estranged wife. The trial court imposed a mandatory life sentence following the unanimous verdict. The defendant appeals. For the following reasons, we affirm.

**Factual and Procedural Background**

The record indicates that Mary Elizabeth "Liz" Marinello was shot twice in the face at approximately 3:57 p.m. on Thursday, August 31, 2006. The offense occurred while Liz was in the parking lot of the Metairie Towers office building in Jefferson Parish. Although others found Liz immediately after the shooting and she was taken to the hospital, she died during the early morning hours of September 1st.

Responding officers from the Jefferson Parish Sheriff's Office (JPSO) learned that Liz was shot while leaving her therapist's office after attending her regularly scheduled therapy session. The investigating detectives also learned that Liz was in the midst of divorce proceedings with her estranged husband, Vincent Marinello.

Witnesses informed detectives that, in the time frame immediately before the murder, as well as in the days preceding the murder, a man was seen in the area riding a bicycle. Among other things, witnesses described the man seen on the day of the murder as warmly dressed for the August temperatures and explained that he had facial hair.

A detective was assigned to retrieve the security camera footage from Metairie Towers, located at 433 Metairie Road. He explained it revealed a person standing in and moving about the parking lot before the murder. At trial, one witness verified that the person on the video tape met the description of a man who made her nervous when she exited the building shortly before the murder.

In an initial statement to detectives, Mr. Marinello explained that on the evening of August 31st, he was at the home of friends, Annette and David Daniels, in Mississippi. He stated that he left the Lakeview[1] area of Metairie at approximately 3:15 - 3:30 p.m. and arrived at the Daniels' home at around 6:00 p.m. Detectives obtained Mr. Marinello's cell phone records from the relevant time period and spoke with the Daniels regarding a .38 caliber revolver once in their possession.

Subsequently, detectives executed search warrants of, among other places, the white Ford Taurus Mr. Marinello was driving as a loaner vehicle and the FEMA trailer where he was living following his separation from Liz. Detectives also interviewed witnesses regarding Mr. Marinello's alleged purchase of a fake mustache and .38 caliber bullets consistent with fragments recovered from the body of the victim.

A grand jury indicted Mr. Marinello for second degree murder in December 2006. In light of media coverage, the trial court granted the defendant's motion for change of venue. In December 2008, following a jury trial in Lafayette in the Fifteenth Judicial District,[2] a jury returned a unanimous verdict of guilty as charged.

The defendant appeals, assigning the following as error:

1) The evidence introduced in the trial of this case was insufficient to prove that Appellant was the person who shot and killed Mary Elizabeth Marinello.

---

[1] Testimony established that Mr. Marinello considered a house in the Lakeview area his long-term residence although the home was in the name of his former wife, Andrea Marinello. The Marinello home and the Daniels' home were flooded from the effects of Hurricane Katrina. Thereafter, the Daniels relocated to Byram, Mississippi, where, according to testimony, Mr. Marinello was a frequent visitor. Testimony indicates that, in addition to being neighbors, the defendant and the Daniels were longtime friends. Mrs. Daniels testified that she and the defendant, at one time, had a romantic relationship, but that the relationship had ceased.

[2] The Supreme Court of Louisiana appointed Judge Cornelius Regan of the Twenty-Fourth Judicial District Court to serve as Judge Ad Hoc of the Fifteenth Judicial District Court for the purpose of presiding over the trial of this matter.

2) The trial court erred in permitting the prosecution to introduce alleged other bad acts and uncharged offenses. The court also erred in allowing prosecution witness Gwen Hanhart to testify as to the personal advise [sic] she gave her divorce clients. Further, the prosecution's closing argument and rebuttal argument unduly highlighted this improperly admitted evidence and the requested mistrial should have been granted. Admission of this highly prejudicial evidence violated Appellant's right to a fair trial guaranteed to him by U.S. Constit. Amend. 5 & 6 and La. Constit. Art. I, § 16.

3) The trial court erred in denying the defense's request to disqualify the Jefferson Parish District Attorney's Office from prosecuting the case.

4) The trial court erred in denying the defense's Motion to Quash the Grand Jury Indictment.

5) The trial court erred in denying the Motion to Suppress Evidence.

6) The trial court erred in denying the Motion to Suppress Cell Phone Records.

7) The demeanor, actions and arguments of the prosecutors during the trial of this case exceeded those acceptable and were so prejudicial as to deny Appellant his constitutionally guaranteed right to a fair trial.

8) The trial court erred in denying the Motion to Quash Indictment as Constitutionally Deficient.

In a pro se brief, the defendant supplements several of the above assignments.

*Errors Patent*

Our review of the record pursuant to La.Code Crim.P. art. 920 reveals no errors patent.

*Sufficiency of the Evidence*

The defendant first contends that the State did not prove that he was the individual who killed Liz. He asserts that the State's case was flawed by its failure to present the bicycle allegedly ridden by the suspect, present the weapon used, connect the weapon to him, or present the beard allegedly worn by the suspect. He

3

also points out that no bloody clothing was recovered and that the victim's blood was not found inside of his car. As he did at trial, the defendant questions the State's characterization of a "checklist" recovered from his trailer and further argues that the State did not establish a motive for the crime. Although he and the victim were divorcing, he contends that the process was no more turbulent than most. Finally, the defendant contests the recollection and credibility of several witnesses.

In *State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86, the supreme court explained that:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id*.

The jury convicted the defendant of second degree murder, defined at La.R.S. 14:30.1(A)(1) as: "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" While the defendant points to what he contends are weaknesses in the State's case, the record contains more than sufficient evidence to support the conviction of second degree murder, particularly when viewed in the light most favorable to the State as required by the *Jackson* standard.

Captain Dennis Thornton, Commander of the JPSO Homicide Division, explained that, after the call regarding the crime was received at 3:58 p.m., he traveled to the scene. He assigned himself scene investigator. While on site, he

4

spoke with Mary Ann Catalanotto, a social worker whose office is in Metairie Towers. She explained that Liz had a standing appointment each Thursday at 3:00-3:50 p.m. to address anxiety and depression related to marital problems. Captain Thornton testified that Ms. Catalanotto explained to him that the defendant was aware of the appointment as he attended sessions with Liz in the past. Captain Thornton also learned that Liz and the defendant were in the midst of divorce proceedings.

The State presented further evidence surrounding the difficulties of the Marinello marriage as a potential motive for the murder. Attorney Gwen Hanhart testified that she filed a divorce petition on Liz's behalf on July 10, 2006. She explained that the defendant vacated the marital home in Harahan between July 24th and August 1st. On August 2nd, she prepared an amended petition asking that the marriage be annulled due to an allegation that the defendant was not divorced from his former wife at the time of the marriage. Ms. Hanhart explained that, after speaking with the defendant's attorney, she drafted a consent judgment and, on August 31st, sent the original judgment to him.

The State also presented video surveillance footage and testimony in support of its theory that the defendant, dressed in disguise and riding a bicycle to the scene, killed Liz. Sergeant Dax Russo of the JPSO retrieved the surveillance footage from Metarie Towers. Sergeant Russo explained that the State's suspect, wearing a cap and a flannel/plaid type shirt over a white shirt, first appeared on the video at 3:30 p.m. and that he paced in the parking lot area, with arms crossed at times, in the following minutes. He testified that, by 3:53 p.m., the suspect moved in the direction of Liz's vehicle and the victim left the building three minutes later. Sergeant Russo stated that Liz was found in the area of her vehicle and suggested that an elongated

pixel on the video at 3:57 p.m. showed her on the ground.[3]

Workers in the office building also testified regarding the presence of the suspect. Patricia Weidie explained that she exited the building at approximately 3:50 - 3:55 p.m. and that a man with a fake-looking beard, jeans, hat, and a long-sleeved flannel shirt caused her concern when she saw him in the parking lot. She stated that he was within very close proximity to where the victim was shot. Stanton Bundy, whose office overlooks the parking lot, testified that, immediately after he heard two shots, he saw "a scruffy old guy" riding a bicycle through a row of cars in the parking lot. He then saw the victim lying on her back. Additionally, a nearby resident stated that he saw a man overdressed for the hot day in a flannel shirt pedaling furiously to leave the parking lot no more than twenty to thirty seconds after he heard the shots.

Sergeant Russo also testified as to a portion of the video which the State asserted showed a 2006 white Ford Taurus driving into the parking lot earlier in the afternoon. The State entered additional evidence indicating that an area Ford dealership provided the defendant with a loaner 2006 white Ford Taurus earlier in the month. This vehicle was seized from the defendant pursuant to a search warrant.

Other evidence focused on the defendant's identity as the poorly dressed man. Lauren White, a teacher at a nearby grammar school, explained that on the three afternoons prior to the murder, she was with students at the front of the school when she noticed a man appearing to be a vagrant riding a bicycle toward Metairie Towers. She described the man as focused with "scary" eyes. Ms. White stated that he wore

---

[3] A portion of the footage reveals another male in the lobby of Metairie Towers prior to the murder. The defendant suggested that his presence presents some confusion as to witness accounts of a poorly dressed man in the area. Yet, an employee of a nearby church identified the individual and stated that he visited the church between 3:15-3:30 p.m. on August 31st seeking a gasoline voucher. She referred him to a charity located in Metairie Towers. When shown a picture of the suspect from the surveillance footage, she stated that it was definitely not the man who visited the church.

the same type of clothing each day and that his presence concerned her. She explained that he returned to the area on the first three days. However, and although she saw him travel in the direction of Metairie Towers on the day of the murder, she did not see him return that day. Ms. White stated that the man appeared more relaxed on this fourth day. She testified that she had "no doubt" that the man was the defendant and that she identified his mug shot when it was shown on television.

A maintenance worker at the school testified that on the afternoon of August 31st, she saw a man with facial hair exit a white car parked in the teachers' parking lot and remove a bicycle from the trunk. Also, Spencer Harris explained that while waiting for his son at the school, a disheveled looking man driving a white Ford Taurus turned in front of him, parked, and then struggled to pull a bicycle from the back seat of the car. He stated that the man was dressed warmly for the heat as he had on at least two shirts, with a flannel outer shirt. Mr. Harris stated that the man's beard was unkempt and that he wore a cap. He contacted the police when the suspect's description was released.

Diane Newman, the Operations and Program Director at the radio station where the defendant worked, testified that she granted the defendant's August 14th request for vacation from August 28th through September 8th. The defendant later requested to be off of work August 23th through 25th as well. Ms. Newman testified that the defendant was usually "even keeled," but that, during the summer, she found him "more irritated, aggravated . . . angry even." The defendant testified that he was burned out during this period due to the circumstances of his work schedule following Hurricane Katrina.

Todd Menesses, an assistant program director at the radio station where the defendant worked, testified that he saw the defendant in the station's elevator on the morning of August 31st. Mr. Menesses explained that he believed that the defendant was out of town, but that he told him he would be leaving later that day. Mr. Menesses stated that the defendant was typically very well dressed, yet on August 31st, he was dressed like a "hobo," was unshaven, and was wearing wrinkled and old clothing. When he learned of the murder and the description of the suspect the next morning, Mr. Menesses called Ms. Newman and stated that he thought the defendant killed Liz.

The Commander of the JPSO's Public Information Office explained that he repeatedly attempted to contact the defendant in the hours after the murder. When the defendant returned the call the following day, he stated he was out of town. The record indicates that the defendant agreed to provide a statement to the JPSO and was accompanied by his attorney when he provided the statement. The defendant explained in the statement that he left his home for the Daniels' home in Jackson, Mississippi[4] at approximately 3:15 - 3:30 p.m., traveled I-10 to I-55, and did not stop along the way. He estimated his arrival time to be somewhere around 6:00 p.m. At trial, the defendant testified that he arrived in the 6:15 - 6:30 p.m. range.

However, the State presented the defendant's cell phone records from August 31st and September 1st, which the jury could have considered contrary to the defendant's assertion that he left town prior to the murder. AT&T representative Tracey Andre explained that a call was placed from the defendant's cell phone at 1:58p.m. It originated within a half mile of the cell tower located at 433 Metairie

---

[4] As previously explained, the Daniels resided in Byram, outside of Jackson, Mississippi.

8

Road.[5]  Between 1:58 p.m. and 4:51 p.m., there was no cell phone activity. According to Mr. Andre, the records further indicated that, at 4:51 p.m., the defendant's cell phone received an incoming call which was not connected and, at the time, the telephone was located within five miles of a Ponchatoula, Louisiana cell tower.  Other incoming, but unanswered calls, were received at 4:56 p.m. and registered at a cell tower located in Hammond, Louisiana, at 5:09 p.m. and at 5:11 p.m., both registered at a tower in Amite, Louisiana, and at 5:16 p.m., registered at a site in Fluker, Louisiana.  According to Mr. Andre, the phone was located south of Fluker, Louisiana at that time.  The records also include an outgoing call at 10:37 p.m, while located in the Jackson, Mississippi area.[6]

Captain Maggie Pernia of the JPSO traveled to Byram to interview Mrs. Daniels at her home on September 6th.[7]  According to Captain Pernia, Mrs. Daniels explained that the defendant arrived, ate, and turned on the television simultaneously and that the New Orleans Saints football game was in progress.  Captain Pernia testified that the football game had a 7:30 p.m. kickoff.  Yet, Captain Pernia explained that, in Mrs. Daniels initial interview on September 2nd, she stated that the defendant arrived between 5:00 and 6:00 p.m.

At trial, Mrs. Daniels explained that, between the defendant's arrival time and the beginning of the football game, the defendant accompanied her to a convenience store.  Captain Pernia testified that Mrs. Daniels did not mention an excursion to a store in her statement.  Mrs. Daniels' adult daughter testified that when she first saw

---

[5] In addition to 433 Metairie Road being the scene of the murder, testimony indicated that the defendant's mother resides in a condominium overlooking the office building's parking lot.

[6] Testimony indicates that the defendant placed a call to his broadcasting partner after learning of the shooting.

[7] Mrs. Daniels was first interviewed on September 2nd.

the defendant in the home that evening, he was on the sofa reading the newspaper and the 5:00 or 6:00 news was on television.

Captain Pernia stated that she traveled to Byram on another trip, basing her travel on the cell phone record information. She testified that she left for the 170 mile trip to Byram at 4:10 p.m. She began the trip from the location where a witness saw a white Ford Taurus at that time on August 31st. Captain Pernia explained that the location is two blocks from the crime scene. She testified that she drove the speed limit and arrived in Ponchatoula at 4:56 p.m., at the second Hammond exit at 5:03 p.m., the Amite exit at 5:16 p.m., Exit 50 at 5:19 p.m., and the Greenberg / Fluker exit at 5:22 p.m.. She explained that the mileage from Fluker to Byram is one hundred miles and that portion of the trip took her one hour and twenty-six or twenty-seven minutes. Captain Pernia stated that the full trip was two hours and thirty-nine minutes. Captain Pernia believed that, in light of the information she obtained, there were at least forty-one minutes of unexplained time.[8] She admitted on cross-examination that she did not know what the travel conditions were for the defendant nor his travel speed.

The State also presented expert testimony regarding autopsy and ballistic results to establish that Liz was killed by NyClad ammunition. Captain Timothy Scanlan, who was accepted as an expert in the field of firearms and tool mark examination, explained that NyClad ammunition is rare. He stated that Elliot's Gun Shop was the only store found to be selling the ammunition in the New Orleans area. Further, he explained that examination of the projectile recovered during the autopsy showed that it was consistent with use in a Charter Arms .38 caliber handgun.

---

[8] The State suggested during argument that the defendant used this period of time to dispose of evidence along the travel route.

In their statements, the Daniels explained that they had given a .38 caliber handgun to the defendant as a gift in the 1980s, but that the defendant returned the gun to them. Mr. Daniels also informed the detectives that, when he asked his wife about the gun, she stated that she had given it to the defendant. Yet, Mrs. Daniels denied having given the gun to the defendant and stated that the last time she saw the gun it was in a bathroom closet in their home that was flooded from the effects of Hurricane Katrina. She explained, however, that the defendant had access to her Lakeview home after the storm. At trial, Mr. Daniels testified that he thought he was perhaps mistaken about his wife having stated that she gave the gun to the defendant. Captain Timothy Scanlan of the JPSO Crime Laboratory explained that a trace report from the Department of Justice revealed that the gun purchased by Mr. Daniels was a Charter Arms .38 caliber handgun. He explained that it was consistent with the type of weapon used in the murder.

In his first statement to police, the defendant denied having owned or fired a handgun, but stated that he purchased a 9 millimeter handgun at Elliot's within the previous month. He did so because his Lakeview neighborhood was dark at night and sparsely populated. Afterwards, on September 5th, detectives traveled to Elliot's and retrieved a receipt for the 9 millimeter handgun.[9] While leaving the store, an employee, Allen Reese, approached the detectives and informed them that, on a previous occasion, in July, the defendant entered the store with a .38 caliber handgun for test firing. Among other things, he explained that the defendant purchased NyClad ammunition. According to Sergeant Donald Meunier, the homicide

---

[9] Although a 9 millimeter handgun was found in the defendant's trailer, detectives determined that the weapon had no evidentiary value, as it was not consistent with the weapon used in the crime.

supervisor, information regarding the type of ammunition used in the crime had not been released at that time.

In a follow-up interview on September 6th, the defendant reiterated his purchase of the 9 millimeter handgun and further explained that he once had the gun originating with the Daniels, but that he returned it twenty years earlier. He also revealed that he once possessed his son's .357 magnum handgun, but that he returned it when he married Liz. He later recalled that two older guns[10] were recovered from his flooded residence, including a .38 caliber handgun that the defendant believed belonged to his grandfather. He could not recall at that time what he had done with the weapon, suggesting that he possibly could have discarded it. When informed that the detectives learned that he purchased ammunition for a .38 caliber handgun, he stated that he may have purchased the ammunition. However, he denied having purchased a .38 caliber handgun, but he stated that he discussed the possibility with store employees. He denied taking a gun into the store. Yet, at trial, he testified that he had taken a gun to Elliot's for test firing, but he denied it was the one originating from the Daniels' home. He explained it was one of the older guns discovered in his home. Also at trial, he denied buying .38 caliber ammunition or NyClad ammunition.

David Selmo, a handyman renovating the defendant's Lakeview residence, testified that, in late July or in August, the defendant became aware of his military background and knowledge of firearms. At that time, he and the defendant had a conversation regarding firearms during which the defendant retrieved an older vintage .38 caliber handgun from his vehicle. He stated that, at one portion of the conversation, the defendant inquired whether one could put a silencer on a .38. Mr.

---

[10] At trial, the defendant stated that three guns were recovered from the home.

Selmo explained that the use of a silencer would not be possible on such a weapon. Mr. Selmo contacted investigators after a JPSO press conference on the details of the murder made him concerned that he held the defendant's gun. Mr. Selmo confirmed that the press conference included information regarding what the State referred to as a "checklist" recovered from the defendant's trailer.

With regard to the checklist, Sergeant Meunier explained that he was stunned by the discovery of the document as it contained case specific information, some of which had not been released to the public. When asked what the list stated about the gun, Sergeant Meunier stated: "The gun, dash river on the way to mama." The State inquired as to other items on the list, including lines relating to the rental of a car, motive, various items of clothing, a bike, mustache, and a diagram of the parking lot/murder scene. While the State described this list as a pre-murder checklist, the defendant admitted that he authored the list,[11] but stated that it was a list he compiled after the murder in an attempt to prove his innocence. He explained that the term "mama" was used to refer to Mrs. Daniels and that he felt that investigators thought that the gun was discarded en route to Mississippi. The defendant testified that he planned to contact Sheriff Harry Lee after completing the list. Among other telephone numbers included on the list is one underneath the inscription "Harry Lee."

As stated above, witnesses testified that the man they saw in the area had some type of facial hair. The list found in the defendant's trailer further contained the notation: "mustache - OK". Captain Thornton testified that witness descriptions of the mustache and beard raised the question of whether they were real or not. He explained that the investigation led him to a wig store in New Orleans where he was

---

[11] Several of the State's witnesses testified regarding Mr. Marinello's copious note taking in preparation for his radio broadcasts.

informed that the defendant purchased a mustache on August 22nd. The employee also stated that, when he inquired whether the defendant needed spirit gum to apply the mustache or a beard, the defendant responded that he had them. During a re-interview, Captain Thornton asked the defendant whether he had a beard or mustache. The defendant explained that he had worn a hair piece for a number of years and had recently purchased a mustache in order to change his appearance. He denied, however, that he purchased the mustache as a disguise. He stated that he discarded the mustache because he did not like it.

With regard to the white Ford Taurus, Captain Scanlan explained that the driver's side door, arm rest, and a large portion of the steering wheel returned a presumptive positive for gunshot residue. A box of 9 millimeter bullets retrieved from the glove box was determined not to be a source of the residue found elsewhere. Captain Scanlan further noted that the vehicle was scratched on the rear. He stated this was documented due to witnesses who informed investigators they saw someone struggling to get a bike out of a car.

In light of the evidence, it is apparent that the State presented ample evidence to support the jury's conviction, specifically the defendant's identity as the perpetrator. Witness testimony indicated the deteriorating and volatile nature of the couple's relationship and, further, indicated that the defendant was aware of the time of Liz's standing appointment. Although the defendant accounted for his location at the time of the murder, the jury could have disregarded this alibi in light of the cell phone records from the associated time frame and concluded that he had sufficient time to travel to Mississippi following the murder. Similarly, it was able to evaluate the testimony of Mrs. Daniels regarding the time of the defendant's arrival. Just as

the jury was able to disregard the defendant's alibi, it could also have rejected that portion of his testimony denying his involvement in the murder.

Further, testimony supported a determination that the defendant possessed or had access to a .38 caliber handgun, despite the gun not having been located, and that the defendant purchased the type of ammunition recovered from the autopsy. The jury also learned that the defendant drove a white Ford Taurus, which was the type of vehicle identified by witnesses as being at a nearby school where they saw a man remove a bicycle from either the trunk or the back seat. While certain differences may have existed as to witness accounts, it is within the jury's province to weigh and evaluate these statements.

Also, witnesses described the man seen before the murder as having facial hair. The jury learned that the defendant purchased a mustache in the weeks preceding the murder and, according to the salesperson, he stated that he owned a beard. One witness identified the defendant as the man she saw riding the bicycle. While again the defendant questioned the reliability of her statement and, in fact, testified that he was unable to ride a bike due to an injury, the jury was tasked with, and obviously made, these credibility determinations.

Although the defendant pointed to another person seen in the office building as perhaps being the man seen by others in the area, the jury heard evidence regarding the other man's identity. It also viewed the surveillance footage showing the other man only in the front portion of the building, whereas the alleged perpetrator was in the rear of the building in the time frame before the murder.

With regard to the State's burden of proof as to specific intent under La.R.S. 14:30.1, certainly the circumstances of the offense support the jury's determination. Evidence was presented as to an elaborate scheme for the perpetration of the offense and two shots were fired at a close range. *See State v. Reed*, 00-1537 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, *writ denied*, 02-1313 (La. 4/25/03), 842 So.2d 391.

In light of this abundance of evidence, and despite the deficiencies alleged by the defendant, the jury could have found that the State proved that the defendant was the perpetrator who killed Liz and that it proved this beyond a reasonable doubt. To the extent that the defendant's conviction was based on the jury's assessment of witness credibility, we do not second-guess this type of determination. *See State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983).

This assignment lacks merit.

*Introduction of Evidence*

The defendant next questions the introduction of a variety of evidence. He first contends the trial court erred in allowing the introduction of alleged other bad acts and uncharged offenses, including bigamy, filing a false public record, and purported FEMA fraud. The defendant also contends the trial court erred in allowing Liz's attorney to testify as to advice she gives her divorce clients. Additionally, he asserts that the State's closing argument emphasized this evidence and, thus, a mistrial urged by defense counsel should have been granted.[12]

---

[12] The defendant contends in the opening portion of this assignment that his motion for mistrial should have been granted. However, he puts forth no further argument in the assignment of error regarding the mistrial requested during closing argument. Thus, we consider this argument abandoned pursuant to Uniform Rules—Courts of Appeal, Rule 2-12.4.

<u>Other Bad Acts</u>

The trial court conducted a hearing on the State's intention to offer evidence pursuant to La.Code Evid. art. 404 due to allegations of bigamy and filing of a false public record. The State introduced the marriage certificates of the defendant's three marriages, a petition for divorce filed by his second wife, Andrea, a motion for preliminary default related to that divorce, and the subsequent judgment of divorce. The State asserted that these proved the defendant and Liz applied for a marriage license before Andrea filed for divorce, and that the defendant married Liz before his divorce from Andrea was final. Additionally, the marriage certificate for his marriage to Liz indicated the defendant stated that he had been divorced from Andrea since 1982, whereas this divorce was not finalized until three days after the defendant's marriage to Liz in October 2004. The State contended that these allegations were relevant to the defendant's motive, opportunity, intent, and preparation. The defendant argued they were offered only to show that he was a bad person and had little probative value. He contends that the trial court never rendered a ruling as to the admissibility of the documents and, therefore, a *de novo* review is required.

Louisiana Code of Evidence Article 404(B)(1) generally provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Such evidence, "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident[.]" *Id.* Even if admissible under Article 404(B)(1), "the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense." *State v. Rose*, 06-0402, p. 12 (La. 2/22/07), 949 So.2d 1236, 1243. Further,

17

the court must still perform the balancing test of La.Code Evid. art. 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]"

As the defendant points out, the record contains no ruling by the trial court following the Article 404 hearing. However, the parties appear to agree that the trial court found certain evidence admissible. This is demonstrated both by the introduction of evidence surrounding the marriages and discussion at the time of the defendant's motion for a mistrial during closing arguments.[13] After review, we find no error in the trial court's admission of the evidence surrounding the defendant's marriages.

Instead, the record supports a determination that the evidence was probative of both motive and intent. The State argued that the defendant killed Liz due to their acrimonious divorce proceedings. The evidence at issue was probative of that point insofar as it gave context to the deteriorating Marinello divorce proceedings and Liz's

---

[13] At a bench conference during the State's closing argument, defense counsel moved for a mistrial as follows:

MR. FLEMING:
   I object to him offering evidence of bigamy. That was offered for a somewhat limited purpose. Other crimes to confirm the limited purpose of this Court over our objection. Mr. Block has gone too far at this point, and we move for a mistrial.

THE COURT:
   Do you have something to say, Mr. Block?

MR. BLOCK:
   You've got a charge in your charges to evidence of other crimes, and what they use it for. We previously had a [P]rieur hearing. The bigamy issue and filing of false public records Mr. Marinello admitted to on the stand is relative, probative and fine for rebuttal argument, Judge.

THE COURT:
   I'm going to overrule your objection, and deny your motion for mistrial.

allegations of bigamy raised therein. Certainly the probative value of this evidence of motive and intent cannot be seen as substantially outweighed by the danger of unfair prejudice to the defendant by the jury being made aware of the allegations underlying the divorce proceedings. Neither do we find merit in the defendant's contention that the State's theory that the defendant was fearful of negative publicity regarding the bigamy allegation had little probative value since much of the information was public record and, therefore, could have been discovered whether Liz was alive or not. It would have been reasonable for a fact finder to conclude that the risk of dissemination was greater in divorce proceedings than only filed into public records.

Notice

The defendant also contends the record does not contain notice of the State's intent to offer evidence of FEMA fraud or fraud in obtaining funds from Hurricane Katrina donations from co-employees.[14] He argues that because the State failed to comply with *State v. Prieur*, 277 So.2d 126 (La.1973), the evidence was improperly admitted. However, we observe that he did not object at trial to the lack of notice, and, therefore, this argument is not preserved for review. *See* La.Code Crim.P. art. 841;[15] *State v. Welch*, 615 So.2d 300 (La.1993). Further, the defendant and several witnesses testified regarding his receipt of hurricane-related funds. Yet, the record

---

[14]   These allegations and evidence related to funds received in connection with losses sustained during Hurricane Katrina when his Lakeview residence was owned by Andrea.

[15]   Louisiana Code of Criminal Procedure Article 841(A) provides, in part:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

contains no objections in this regard. Accordingly, the admissibility of this testimony is not properly before this court for review.

Attorney Testimony

The defendant also contends that the trial court should not have permitted Ms. Hanhart to testify regarding her general advice to clients that they allow a time delay following a judgment of divorce before remarrying. He asserts that Ms. Hanhart was neither qualified as an expert nor was the testimony relevant to what he believed or had been told by his own attorney.

The passage at issue is as follows:

Q. And what advice do you give them with respect to time delays?

MR. FLEMING [Defense Counsel]:
I'm going to object, Your Honor, as to the relevancy of what Ms. Hanhart advises other clients.

THE COURT:
I'm going to overrule your objection. You can answer that.

THE WITNESS:
A. As a general rule, when one party files a lawsuit against the other, you file your lawsuit, the person is served, and then there is a delay time that runs when the defendant - -

MR. FLEMING:
I'm going to object as non-responsive to the question. Ms. Hanhart is giving a legal opinion at this time, not what she advises her clients.

MR. PACIERA [Assistant District Attorney]:
I think she's answering what she advises her clients.

THE COURT:
I think she's advise - - I'm going to overrule your objection, Mr. Fleming.

THE WITNESS:
A. I advise them there's a delay period of 15 days within which the defendant or the other party has to file an answer. You have to wait that 15 days. If there is no answer filed by that time, then you can ask the

20

court to enter what's called a preliminary default. And then two days after that, you can, what we call, confirm the default. And then I also strongly recommend that even once there's a judgement rendered after that period of time, that my client wait at least 40 days before remarrying since the judgment can be appealed during that approximate 40-day-period.

On appeal, defense counsel appears to argue that the above statement required an expert opinion. The colloquy, however, reveals that defense counsel did not object to advice Ms. Hanhart gave to her clients and specifically attempted to distinguish permissible advice testimony from a legal conclusion. In fact, early in the colloquy, the trial court sustained an objection when it determined that the question called for a legal conclusion. In light of this narrow ruling by the trial court, and pursuant to Uniform Rules—Courts of Appeal, Rule 1-3,[16] we find that defense counsel may not urge this nuance of the argument for the first time before this court.

Defense counsel specifically objected, however, to Ms. Hanhart's testimony insofar as he contended it was not relevant. Louisiana Code of Evidence Article 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403. A trial court's determination as to relevance is accorded great weight and should not be

---

[16] Rule 1-3 provides, in part, that "[t]he Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise."

overturned absent a clear abuse of discretion. *State v. Stringer*, 06-800 (La.App. 3 Cir. 12/6/06), 949 So.2d 464, *writ denied*, 07-0004 (La. 9/14/07), 963 So.2d 996.

On review, we find no abuse of discretion in the determination that the testimony was relevant in that it explained the divorce process to the jury. The trial court could have determined that this questioning was related to the State's argument that fear of public exposure of bigamy allegations was a potential motive in the killing. Even if arguably irrelevant, however, the admission of the evidence was harmless. *See State v. Casey*, 99-23 (La. 1/26/00), 775 So.2d 1022 (wherein the supreme court explained that erroneous admission of evidence requires a reversal only if there is a reasonable possibility that the evidence might have contributed to the verdict), *cert. denied*, 531 U.S. 840, 121 S.Ct. 104 (2000). The State's evidence in this case was ample, with no indication that this limited evidence might have contributed to the verdict.

Supplemental Argument

In his supplement to defense counsel's argument regarding other crimes evidence, the defendant contends that the State impermissibly implied that he was a member of the Mafia. He points out that the State did not file notice regarding its intent to use evidence on this issue and no *Prieur* hearing was held in this regard. The defendant further asserts the State failed to produce evidence that he had ever been connected to a criminal organization, but made repeated references to the Mafia. He cites a portion of *U.S. v. Kemp*, 156 F.3d 1233 (6th Cir. 1998), for the proposition that a prosecutor's association of a defendant with a particularly negative historical figure may warrant reversal.[17]

---

[17] In *Kemp*, the court found the defendant failed to timely object to the prosecutor's reference to Al Capone. Thus, the matter would only be reviewed for plain error. The court noted that plain

The defendant cites the following portions of the record:

Q. Mr. Marinello, do you have a fascination with the Mafia?

A. I don't know what the Mafia is.

Q. You don't?

A. No, sir, I don't.

Q. You are kidding, right?

A. Why would I kid? No, sir.

. . . .

Q. Okay, but you don't know what the Mafia is?

A. I don't know specifically, no. I'm not in the Mafia, so I wouldn't know specifically what the Mafia is.

Q. You were fascinated with John Gotti; were you not?

A. I knew of John Gotti, yes.

However, the defendant waived his objection to a lack of notice of the State's intent to use evidence when he failed to object at trial. *Welch*, 615 So.2d 300. Further, he did not object to testimony regarding the Mafia for the argument now made, *i.e.*, on a "bad acts" basis. Accordingly, it was not preserved for review.

error references a particularly egregious error and should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result. Even if we were to find this opinion persuasive here, which we do not, resort to plain error would not be appropriate as Louisiana courts have rejected adoption of a general "plain error rule" in review of criminal cases. *See State v. Pyke*, 93-1506 (La.App. 3 Cir. 5/4/94), 640 So.2d 460. An exception to the contemporaneous objection requirement has been found in rare cases but has been found where the error involves the definition of the crime and "'the record bears full and sufficient proof of the error which no posterior hearing could augment.'" *Id.* at 463 (quoting *State v. Williamson*, 389 So.2d 1328, 1331 (La.1980)).

Also in his supplemental argument, the defendant contends that the State violated La.Code Crim.P. art. 774[18] by attempting to exploit the jury's sympathy. He cites the following remarks in the State's closing argument:

> The reason we are here, ladies and gentlemen, is not because Vincent Marinello, he enjoys the attention, he enjoys the adoration. This is a big show for him. The reason we are here is for Liz Marinello, who was 45 years old w[hen] she was murdered, when she was shot two times in the face.

> Why do you shoot someone two times in the face, Mr. Marinello? In the mob life what does that mean? Shoot them two times in the face, why. It is personal, and you don't want them to have an open casket. What kind of man does this, leaves a ten year old child without a mother. The child turned ten years old two days before her mother was murdered. This case isn't about Vincent Marinello, it is about his actions, his arrogance, his greed, his cold and calculated demeanor.

> Liz Marinello, she liked to garden, she liked riding bikes, she liked to go to the [movies] and see plays, and she loved her daughter .
> . . .

Yet, the defendant failed to object to the remarks made during closing argument. Thus, he failed to preserve the alleged error for review. La.Code Crim.P. art. 841.

This assignment lacks merit

*Disqualification*

In pretrial proceedings, the defendant attempted to disqualify several assistant district attorneys and, also, sought recusal of the district attorney's office. The claim stems from conversations the defendant had with the district attorney and assistant

---

[18] Article 774, pertaining to the scope of argument, provides:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.

> The argument shall not appeal to prejudice.

> The state's rebuttal shall be confined to answering the argument of the defendant.

district attorneys, beginning in January 2006 regarding Mr. Marinello's allegation that Liz's former husband was harassing them and, later in July 2006, his own allegation that he was the victim of domestic abuse by Liz.[19] Ultimately, the trial court disqualified five assistant district attorneys[20] from participating in the case before the petit jury or from acting as an advocate in the matter. The trial court denied the motion to recuse the district attorney.

The defendant re-urges his argument that the district attorney's office should have been recused. He contends that the assistant district attorneys would likely serve as witnesses at trial and, as they serve at the pleasure of the district attorney, they would be unlikely to be forthcoming for the defense. He additionally contends they were privy to personal information they would not have otherwise had, and some of this information was related to trial issues. Thus, he contends, it was impossible for him to receive a fair trial absent the recusal of the office of the district attorney. He alternatively contends recusal is appropriate in the interests of fairness and to avoid the appearance of impropriety. He seeks a new trial by a different prosecutor due to this claimed error.

Louisiana Code of Criminal Procedure Article 680(1) provides that "[a] district attorney shall be recused when he . . . [h]as a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice[.]" A defendant attempting to recuse a district attorney has the burden of proving this ground for recusal by a preponderance of the evidence. *State v. King*, 06-2383 (La. 4/27/07), 956 So.2d 562. In *King*, the supreme court remarked it had interpreted

---

[19] The record indicates that Liz was arrested on August 7, 2006 due to Mr. Marinello's complaint.

[20] The State stipulated to the disqualification of three of these assistant district attorneys as they would be likely witnesses at trial. The defense accepted this stipulation.

Article 680(1) to embody a policy favoring recusal when a situation raises questions as to whether the district attorney's ability to fairly and impartially perform the duties of office has been impaired, even unconsciously or despite assertions to the contrary. *Id.* Further,

> La.C.Cr.P. art. 680(1) does not envision a subjective determination as to whether the district attorney would, in fact, be unfair. Rather, it employs an objective decision as to whether a reasonable person would believe the facts at issue regarding the district attorney's personal interest in the cause would impair his ability to act fairly and impartially in conducting defendant's prosecution.

*Id*. at 567.

> In denying the motion to recuse, the trial court explained:

> > In this case the Court finds that there was no significant evidence presented tending to show that District Attorney Paul Connick has any personal interest in this case which is in conflict with the fair and impartial administration of justice.

> > In addition, the Court finds that recusation is not mandated by the Louisiana Rules of Professional Conduct, particularly Rules 1.7 and 1.9.

The testimony presented at the hearing on the defendant's recusal motion does not indicate that the trial court erred in finding that he failed to meet his burden of proof. District Attorney Paul Connick denied that he had a relationship with the defendant, but he explained that he would speak if he saw him in passing. In January 2006, the defendant called him regarding an allegation of harassment by Liz's ex-husband. At that time, he explained to the defendant that a complaint could be filed with the appropriate authorities and told him that he would be happy to advise him through the office's Family Violence Prosecution Unit. Mr. Connick forwarded the information he had to the chief of that unit.

Mr. Connick explained that, afterwards, the only contact he had with the defendant was when he encountered him at a restaurant. They only had a short

conversation at that time, wherein the defendant spoke about his radio show. As the two were leaving, Mr. Connick inquired whether the incident had been resolved. The defendant responded that it was "fine[.]"

Mr. Connick also testified that he did not know Liz, or Mr. Marinello's former wife, Andrea. He denied a personal interest in the case and explained that his only interest in the case was the same as in any other case, "insure that justice is served, and that a conviction is based beyond a reasonable doubt on the evidence presented."

Based on Mr. Connick's knowledge and actions in this matter, the defendant failed to prove by a preponderance of the evidence that Mr. Connick had a personal interest in the matter. Thus, the trial court properly denied the motion to recuse the district attorney. Neither is there merit in the defendant's contention that the district attorney's office should have been recused due to the assistant district attorneys' knowledge of the Marinellos domestic disputes. First, La.Code Crim.P. art. 680(1) requires evidence of the "*personal* interest" of the district attorney. (Emphasis added.) The knowledge the assistant district attorneys acquired in their professional roles did not indicate a personal interest of the district attorney. Also, the trial court disqualified and restricted the participation of those assistants who had contact with the defendant.

This assignment lacks merit.

*Motion to Quash - Grand Jury*

The defendant next contests the denial of his motion to quash the grand jury indictment. He advances two grounds for quashing of the indictment. First, he points out that one of the grand jurors worked in Metairie Towers and had conversations about the incident with law enforcement officials and her co-workers. He also

27

contends that the indictment should have been quashed due to the participation of Second Assistant District Attorney David Wolff. The defendant contends that, at the time Mr. Wolff presented the case to the grand jury, he likely knew he was going to be a witness at the trial of the matter.

Individual Grand Juror

The defendant first questions whether a grand juror with prior knowledge of the offense could have permissibly served on the jury. With regard to recusal of a grand juror, La.Code Crim.P. art. 533 provides:

> A motion to quash an indictment by a grand jury may also be based on one or more of the following grounds:
>
> . . . .
>
> (2) An individual grand juror was not qualified under Article 401.

The defendant references La.Code Crim.P. art. 401(B)(2), which provides that a grand or petit juror may be challenged for cause: "When reasonable doubt exists as to the competency of the prospective juror to serve as provided for in Code of Criminal Procedure Article 787." He contends that Article 787[21] must to be read *in pari materia* with La.Code Crim.P. arts. 797 and 798, which set forth grounds for challenging a potential juror for cause. He cites *State v. Letulier*, 97-1360 (La. 7/8/98), 750 So.2d 784, in support of his argument.

The defendant further contends that Article 797(2) permits the challenge for cause of a potential juror who is not impartial and that the record does not reflect that the juror was examined regarding the ability to put aside knowledge of the shooting obtained from law enforcement and/or co-workers. He contends that this was

---

[21] Article 787 provides that: "The court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case."

necessary to insure that the ultimate verdict would not be influenced. He cites *State v. Frank*, 99-553 (La. 1/17/01), 803 So.2d 1.

However, the cases and line of reasoning advanced by the defendant are applicable to petit jurors. Louisiana Code of Criminal Procedure Article 438 specifically addresses a grand juror's knowledge of the offense, stating:

> If a grand juror knows or has reason to believe that an offense triable by the district court of the parish has been committed, he shall declare such fact to his fellow jurors, who may investigate it. In such investigation or any subsequent criminal proceeding the grand juror shall be a competent witness.

Also, in *State v. Vial*, 96 So. 796, 799 (La.1923)(citations omitted), the supreme court explained that:

> The mere fact that a member of a grand jury has made an affidavit against a citizen for the violation of a criminal statute does not disqualify such member and render him incompetent to deliberate upon the case and to vote for the return of a true bill against such offender. The finding of a grand jury is not a verdict or judgment; it amounts, at most, to an accusation, and there is no law which fixes the nature or the quantum of evidence on which the grand jury must rest their conclusions.
>
> It is the legal duty of every member of a grand jury to inform his fellows of any crime or misdemeanor committed within the parish since the sitting of the last grand jury, which may have come to his personal knowledge, or of which he may have been informed, and a violation of this duty is made a criminal offense by section 2140 of the Revised Statutes of 1870, punishable by severe penalties. This section of the Revised Statutes makes it plain that even personal knowledge of the commission of a crime does not disqualify a grand juror. He may therefore be a witness in the case, and still be competent to serve as a member of the inquisitorial body. Hence, the making of an affidavit in a criminal case is not a legal cause for the disqualification of a grand juror.
>
> A grand jury may return a valid indictment into court based on knowledge of the facts by its members, and without having witnesses summoned before that body.

*See also State v. Corley*, 617 So.2d 1292 (La.App. 3 Cir. 1993), *rev'd on other grounds*, 93-1934 (La. 3/11/94), 633 So.2d 151, *cert denied*, 513 U.S. 930, 115 S.Ct. 322 (1994).

Based on the record and the clear authority above, we find no error in the trial court's denial of the motion to quash the indictment due to the presence of the juror.

Prosecutor

With regard to Assistant District Attorney Wolff's involvement in the grand jury proceedings, the defendant asserts that La.Rules Prof.Conduct, Rule 3.7 prohibits a lawyer from being an advocate at a trial in which he is likely to be a necessary witness.[22] He also asserts that a lawyer should avoid the appearance of impropriety and that, because of Mr. Wolff's participation in the domestic matters which the State opined led up to the murder, he should not have presented the case to the grand jury.

However, the party moving to quash an indictment due to defects or irregularities in the constitution of the grand jury must specify the grounds of the motion and support them by distinct and competent evidence. *State v. Pierre*, 3 So.2d 895 (La.1941), *cert. denied*, 314 U.S. 676, 62 S.Ct. 186 (1941).

---

[22] Rule 3.7 addresses lawyers as witnesses as follows:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Review indicates that the defendant presented no evidence sufficient to quash the indictment. Further, the defendant's motion does not set forth a proper basis for a motion to quash under La.Code Crim.P. arts. 532, 533 or 534. Finally, the defendant's citation to La.Rules Prof.Conduct, Rule 3.7 is unpersuasive insofar as it prohibits lawyers from acting as an "advocate *at trial* in which the lawyer is likely to be a necessary witness." (Emphasis added.) Mr. Wolffe did not act as an advocate at trial; instead, his participation was limited to a pretrial matter.

This assignment of error lacks merit.

*Motion to Suppress Evidence*

The defendant next contends that the trial court erred in denying his motion to suppress evidence. The defendant alleged four grounds in support of the motion: 1) judge shopping in violation of the court rules in obtaining a search warrant; 2) nighttime searches; 3) seizure of the vehicle absent a warrant or extenuating circumstances; and 4) information seized from the vehicle fell outside the scope of the search warrant.

After the trial court denied the motion, the defendant applied for supervisory writs in the fifth circuit. The court denied the writ, stating: "WRIT DENIED. On the showing made, we find no reason to disturb the ruling of the trial court." *See State v. Marinello*, an unpublished writ bearing docket number 08-K-4 (La.App. 5 Cir. 1/15/08). The supreme court later denied the defendant's application. *See State v. Marinello*, 2008-KK-0258 (La. 2/13/08), 976 So.2d 167.

In light of this history, we do not consider this assignment of error, as the issues presented were litigated during pre-trial proceedings. In *State v. Chambers*, 99-678 (La.App. 3 Cir. 1/19/00), 758 So.2d 231, *writ denied*, 00-551 (La. 9/22/00), 768 So.2d

31

600, this court explained that a defendant may seek review of a pretrial ruling even after the denial of a pretrial supervisory writ application seeking review of the same issue. However, when a defendant does not present additional evidence on the issue after the pre-trial ruling, the issue can be rejected on appeal. *Id.* Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. *Id.*

The defendant's arguments remain the same as those presented to the trial court and later reviewed by the fifth circuit and the supreme court. Also, we find no patent error in those rulings nor will the determination produce an unjust result. Accordingly, we do not further review this assignment.

*Motion to Suppress - Cellular Telephone Records*

The defendant next questions the denial of his motion to suppress cell phone records. He argues that these records were not kept in the ordinary course of business and, therefore, the State should have been required to demonstrate probable cause for the production of the records rather than by use of a subpoena. He also argues that because there is no specific statutory procedure for obtaining cellular telephone information, the pen register law requirements of La.R.S. 15:1301, *et seq.*, should have been found applicable.[23]

After the trial court's denial of the motion, both this court and the supreme court denied relief. *See State v. Marinello*, an unpublished writ ruling bearing docket number 08-1318 (La.App. 3 Cir. 11/12/08) (remanding the matter for an evidentiary hearing); *State v. Marinello*, an unpublished writ ruling bearing docket number 08-

---

[23] The defendant also asserts that the evidence was improperly introduced due to improper authentication. However, the record does not reveal an objection to the evidence on this point.

32

1427 (La.App. 3 Cir. 11/26/08)(finding no error in the trial court's ruling based on the record submitted), *writ denied*, 08-2817 (La. 12/2/08), 997 So.2d 549.

As in the preceding assignment of error, this court could refrain from reviewing this matter due to its consideration of the pretrial writ applications and the law of the case doctrine. However, we review this issue as the parties introduced additional evidence on the topic at trial. *See Chambers*, 758 So.2d 231.

United States Constitution Amendment IV provides in part that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Further, La.Const. art. 1, § 5 ensures that: "Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy."[24]

The defendant asserts that, because of his privacy interest in the records recovered from AT&T, the State was required to obtain these records by warrant. However, the United States Supreme Court has recognized that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 2582 (1979). Specifically, as it may relate to this case, the Supreme Court has determined that there

---

[24] We note that, by this assignment, the defendant seeks suppression of telephone records, alleging a constitutional violation. We address the assignment in this constitutional context. However, we recognize that much of the jurisprudence on this topic relates to a governmental entity's attempt to obtain communications information through the statutory procedures of the Stored Communications Act (SCA), 18 U.S.C. § 2701, *et seq.*, and not strictly on the constitutional question. *See In re Application of the United States for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't.*, No. 08-4227, 2010 WL 3465170, _ F.3d _ (3d Cir. 2010)(wherein the Third Circuit recently addressed the avenues available to a governmental entity under the SCA to procure wire or electronic communications). As such, the jurisprudence related to this statutory provision, at times, does not fully reach the suppression issue as an exclusion / suppression remedy is not included among the SCA's remedies for non-constitutional violations of its provisions. *See* 18 U.S.C. § 2701, § 2707 and § 2708. *See also City of Ontario, California v. Quon*, _ U.S. _, _ S.Ct. _ (2010).

is no legitimate expectation of privacy in numerical information conveyed to a telephone company in the ordinary course of business. *Id.*

Louisiana jurisprudence has not yet addressed a defendant's privacy interest in historical cell phone information obtained and stored by a telephone provider. However, other jurisdictions have considered similar issues in determining that a warrant is not required for telephone records obtained from a service provider. In *Rehberg v. Paulk*, 611 F.3d 828, 843 (11th. Cir. 2010), the Eleventh Circuit cited *Smith*, 442 U.S. 735, 99 S.Ct. 2577, in concluding that an individual "lacked a legitimate expectation of privacy" in telephone and fax numbers he dialed and that "[o]nce he voluntarily provided that information to BellSouth and Alltel (later Sprint), [he] lacked any further valid expectation that those third parties would not turn the information over to law enforcement officers."

Further, several courts have considered the specific issue of a State's request for historical cell phone records and concluded that a warrant is not required. *See Mitchell v. Florida*, 25 So.3d 632 (Fla. DCA 2009)( wherein the Florida court found that historical cell site information is not content based and that a cell phone's user has no expectation of privacy in such records. It noted that "because historical cell site information discloses only the defendant's past location and does not pinpoint his current location in a private area, it does not implicate Fourth Amendment protections." *Id.* at 635.). *See also United States v. Suarez-Blanca*, 2008 WL 4200156 (N.D. Ga. 2008) (wherein a magistrate for the federal district court for the northern district of Georgia discussed *Smith*, 442 U.S. 735, 99 S.Ct. 2577, in its determination that the Fourth Amendment was not implicated when historical cell phone data did not reveal a defendant's location in private areas); *In re Applications of U.S. for Orders*

34

*Pursuant to Title 18, U.S. Code Section 2703(d)*, 509 F.Supp. 2d 76 (D. Mass. 2007); and *People v. Hall*, 823 N.Y.S.2d 334 (N.Y. App. Div. 2006). *But see In re Application of U.S. for an Order Authorizing Release of Historical Cell-Site Information*, 2010 WL 3463132 _ F.Supp.2d _, (E.D.N.Y. 2010); *In re Application of United States For An Order: (1) Authorizing Use of a Pen Register and Trap And Trace Device; (2) Authorizing Release of Subscriber And Other Information; (3) Authorizing Disclosure of Location-Based Services*, 2010 WL 3021950 _ F.Supp.2d _ (W.D. Tex. 2010).

Review of the records acquired and introduced in this case reveals no error in the trial court's determination that their acquisition by subpoena was sufficient. AT&T's representative, Mr. Andre, was accepted at trial as an expert in radio frequency engineering. He stated that AT&T stores information from each call: the mobile number, the electronic serial number of the phone, the calling number, the time, the location of the phone, the cell site, and the area code for the location.[25] The information is automatically collected and sent to the billing department.

Mr. Andre identified State's Exhibits 133 through 137, which included: a detailed customer bill record which would be provided to the customer, a detailed billed usage record maintained as an internal record; a billing operations record kept for legal and trouble shooting purposes, which lists the mobile phone number, the calling and called numbers, the location code for the cell site, the cell site's identification, the answer time, the release time, and call duration in seconds; a cell

---

[25] At a pre-trial hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), Mr. Andre testified that AT&T retains a database of cell site locations for troubleshooting, billing, and legal purposes. He explained it is maintained as regularly kept business records. He also stated that AT&T has a promulgation tool its employees use to interpret cell site locations. He explained that the company does not share this information with third parties, but that it produces the information if it is subpoenaed and the party produces a court order.

site database kept as a record of all active cell sites for the network in Louisiana, which also provided the location of the cell sites; and a file he compiled showing the cell sites in service in 2006. Mr. Andre maintained that this information was kept in AT&T's ordinary course of business. He also expressed his reliance on this information in the performance of his job. Mr. Andre further identified State's Exhibits 138 through 143 which were maps he prepared for trial depicting the physical location and addresses of the cell sites and calls to/from the defendant's cell phone.

We find support for the trial court's ruling. Mr. Andre's testimony indicates these records were kept in the ordinary course of AT&T's business, as they were maintained for billing and troubleshooting purposes. Further, the records were limited to historical usage data. In light of the nature of this evidence, we find no implication of the United States Constitution's Fourth Amendment insofar as the defendant had no reasonable expectation of privacy in the data received and maintained by AT&T. *Smith*, 442 U.S. 735, 99 S.Ct. 2577. Neither do we find that the trial court was required to find that the protections of La.Const. art. 1, § 5 obligated the State to obtain these records by warrant rather than subpoena.

Finally, insofar as the defendant argues that the State was required to make application for the information by an application for a pen register, we note that La.R.S. 15:1302(15)[26] specifically excludes this type of information.

---

[26] Louisiana Revised Statutes 15:1302(15) provides that:
"Pen register" means a device which records and decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached, *but this term does not include any device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider or any device used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business.*

(Emphasis added.)

36

This assignment lacks merit.

*Prosecutorial Demeanor*

The defendant next contends that the trial court erred in failing to grant a mistrial[27] pursuant to La.Code Crim.P. art. 770.[28]  In addition to the errors he alleges in the preceding assignments, the defendant contends that the prosecutor's demeanor, actions, and arguments exceeded those acceptable and were so prejudicial as to deny him his right to a fair trial.  He contends that he was badgered on cross-examination, that the State made repeated prejudicial comments, and that the prosecutor stated to the jury that he could not be believed.  He also alleges that the State went beyond the scope of the evidence presented at trial during its closing arguments.

Having found no merit in the defendant's preceding assignments of error, we do not revisit those claims as they relate to the defendant's request for a mistrial.  Also, the defendant presents no legal or factual argument regarding claims that his

---

[27] The defendant asserts that defense counsel requested several mistrials, including the following:  1) during the State's opening statement when it referenced a judge's refusal to issue a protective order; 2) during the State's opening statement when it referenced the defendant's invocation of his right to remain silent; 3) regarding the introduction of State's Exhibit 151 after the testimony of Captain Pernia; 4) after Captain Thornton was questioned about the manner in which the defendant's second interview ended; and 5) during rebuttal when the State said there was clear evidence of bigamy.  He also points out a number of objections which were overruled.

[28] Article 770 provides:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
> (1)  Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
> (2)  Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
> (3)  The failure of the defendant to testify in his own defense; or
> (4)  The refusal of the judge to direct a verdict.
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial.  If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

motions for mistrial should have been granted and his objections sustained. Accordingly, we do not address those claims as we deem them abandoned pursuant to Uniform Rules—Courts of Appeal, Rule 2-12.4.

The defendant failed to include specific page references regarding his claims that the State went beyond the scope of the evidence during closing arguments. However, the transcript reveals no objection to the comments the defendant alleges were improper. Accordingly, this issue has not been preserved for appellate review. La.Code Crim.P. art. 841.

We also reject the defendant's assertion that, if his complaints cannot be reviewed due to lack of a contemporaneous objection, they should be considered as a pattern of presenting the defendant as a bad person.

> The combined effect of assignments of error, none of which warrant reversal on its own, does not deprive a defendant of his right to a constitutionally fair trial. *State v. Rochon*, 98-717, p. 14 (La.App. 5 Cir. 3/10/99), 733 So.2d 624, 633. The Supreme Court has noted that the "cumulative error" doctrine has lost favor in the Louisiana courts. *State v. Draughn*, 05-1825, p. 70 (La.1/17/07), 950 So.2d 583, 629. Significantly, the Supreme Court in *State v. Manning*, 03-1982 (La.10/19/04), 885 So.2d 1044, quoted with approval *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir.1987), where the federal Fifth Circuit rejected the cumulative error doctrine by noting that "twenty times zero equals zero."

*State v. Ayo*, 08-468, pp. 29-30 (La.App. 5 Cir. 3/24/09), 7 So.3d 85, 104, *writ denied*, 09-1026 (La. 3/5/10), 28 So.3d 1006.

This assignment of error lacks merit.

*Motion to Quash*

In his final assignment, the defendant questions the denial of his motion to quash the indictment wherein he argues that the format used failed to specify whether the grand jury found that specific intent to kill was present or whether there was an

38

aggravating factor present and there was no specific intent. While the defendant acknowledges that the Louisiana Supreme Court has upheld the constitutionality of the short form indictment in *State v. Baylis*, 388 So.2d 713 (La.1980), and *State v. Liner*, 373 So.2d 121 (La.1979), he observes that these decisions predated the United States Supreme Court decisions in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000); and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215 (1999).

Louisiana Constitution Article 1, § 13 provides, in part, that "an accused shall be informed of the nature and cause of the accusation against him." As explained in *Draughn*, 950 So.2d 583, this requirement is implemented by La.Code Crim.P. art. 464, which states that:

> The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

Article 465 sets forth specific forms permissible for certain offenses. The form for second degree murder at Article 465(32) reads: "Second Degree Murder– A.B. committed second degree murder of C.D." The indictment charging the defendant reflects this format and provides in pertinent part, that:

VINCENT J. MARINELLO

> late of the PARISH OF JEFFERSON, on or about the 31st day of August in the year of our Lord, Two Thousand and Six with force and arms, in the Parish aforesaid, and within the jurisdiction of the Twenty- Fourth Judicial District Court of Louisiana, in and for the Parish aforesaid, violated 14:30.1 in that he did commit second degree murder of Mary Elizabeth Norman Marinello . . . .

In *Draughn*, 950 So.2d 583, the Louisiana Supreme Court reviewed whether the short form indictment was constitutionally deficient for failure to list the aggravating factors necessary for first degree murder or the aggravating circumstances necessary to impose a death sentence. The supreme court stated:

> The constitutionality of short forms has been consistently upheld by this Court. *State v. Baylis*, 388 So.2d 713, 718-19 (La.1980); *State v. Liner*, 373 So.2d 121, 122 (La.1979). When those forms are used, it is intended that a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars. *Baylis*, 388 So.2d at 719; *State v. Johnson*, 365 So.2d 1267, 1270-71 (La.1978); La.C.Cr.P. art. 465, Official Revision Comment (a).

*Id*. at 624. As noted by the defendant, *Draughn* does not include discussion of recent United States Supreme Court decisions.

However, the second circuit considered federal jurisprudence in *State v. Dixon*, 42,594 (La.App. 2 Cir. 1/16/08), 974 So.2d 793, *writ denied*, 08-711 (La. 10/10/08), 993 So.2d 1282, *cert. denied*, __ U.S. __, 129 S.Ct. 1989 (2009) when it reviewed the short form indictment for first degree murder. It addressed each of the cases cited by the defendant, ultimately observing that:

> [W]hile the United States Supreme Court stated that the Due Process Clause of the Fifth Amendment requires all the elements of an offense be alleged in the indictment for federal criminal prosecutions, the Fourteenth Amendment has not been construed to extend that same indictment requirement to the states.

*Id*. at 800 (footnote omitted). The second circuit further remarked that:

> The fact that the short-form indictment was used does not diminish the grand jury's role in the indictment process, and, as noted by the Louisiana Supreme Court in *State v. Draughn*, *supra*, the process for filing an application for bill of particulars gives the defendant additional notice of the charge against which he must defend.

> In the present case, the indictment complied with the short form of Article 465(A)(31), and the state completely responded to defendant's application for bill of particulars. There is no state or federal precedent requiring Louisiana indictments to allege the aggravating facts which are

required for first degree murder or to allege the aggravating circumstances to be considered at the penalty phase of trial. To the contrary, the short-form indictment has been upheld in regard to the Louisiana Constitution. We note, that alleging such aggravating factors in the indictment, which would be read to the jury before trial, could prove prejudicial to defendant.

*Id*.

As explained in *Dixon*, 974 So.2d 793, federal jurisprudence requiring that all elements of an offense be alleged in an indictment pursuant to U.S. Const. art. V has not been construed to extend to the states. Instead, the Supreme Court has specifically refused to determine whether elements used to enhance a penalty must be included in an indictment in a state prosecution. *See Apprendi*, 530 U.S. 466, 120 S.Ct. 2348. Furthermore, the Louisiana Supreme Court has found the short form indictment consistent with the Louisiana Constitution. *See Draughn*, 950 So.2d 583. Accordingly, we find no error in the trial court's denial of the motion to quash.

This assignment lacks merit.

## DECREE

For the foregoing reasons, the conviction of the defendant, Vincent Marinello, is affirmed.

**AFFIRMED.**